## UNITED STATES *v.* GREAT NORTHERN RAILWAY CO.

No. 96. Argued October 11, 1932.—Decided November 7, 1932.

*Solicitor General Thacher,* with whom *Assistant to the Attorney General O'Brian* and *Messrs. Charles H. Weston, Elmer B. Collins,* and *Erwin N. Griswold* were on the brief, for the United States.

*Mr. F. G. Dorety,* with whom *Messrs. R. E. L. Smith* and *R. J. Hagman* were on the brief, for respondent.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The petitioner, the United States of America, has sued to recover a payment made to the respondent, the Great Northern Railway Company, by force of a certificate of the Interstate Commerce Commission, the government asserting that the payment was excessive and that the certificate permitting it was the product of mistake. A judgment of the District Court in favor of the respondent was affirmed by the Circuit Court of Appeals for the Eighth Circuit. 57 F. (2d) 385. The case is here on certiorari.

The respondent was a railroad under federal control when control was relinquished by the government on March 1, 1920. By the Transportation Act of that year (41 Stat. 464, § 209; 49 U. S. C., § 77), it had the protection of a guaranty as to its railway operating income for six months thereafter. The United States guaranteed that during this guaranty period the income should be not less than one-half of the annual compensation to which the carrier was entitled during the period of federal control. *United States* v. *Guaranty Trust Co.*, 280 U. S. 478; *Texas & Pacific Ry. Co.* v. *United States*, 286 U. S. 285; *Continental Tie & Lumber Co.* v. *United States*, 286 U. S. 290. Upon the Interstate Commerce Commission was laid the duty of ascertaining the amounts necessary to make good this guaranty and of certifying to the Secretary of the Treasury the results of the inquiry. Something more was required for this purpose than the mere comparison of receipts and expenses during the period of control with receipts and expenses during the six months following. In the ascertainment of railway operating income, or any deficit therein, the amount to be included in operating expenses for maintenance of way and structures, or for maintenance of equipment, was to be fixed by the Commission, and was not dependent solely on the action

of the carrier. For that purpose reference was to be had
to the tests prescribed by the standard form of contract
for federal control. Transportation Act, 1920, § 209f (3);
Federal Control Contract, § 5a. The Commission was to
take as its base the average six months' maintenance ex-
penses of the carrier during the years characterized as
" the test period," *i. e.*, the three years ending June 30,
1917. This amount was to be readjusted, however, so as
to make allowance for changes in the extent of property
maintained, for changes in the nature or intensity of the
use, and, most important, for changes in the cost of labor
and material. The end in view was the arrival at a figure
that would permit the property to be kept up in the same
state of reparation as at the time when the carrier's pos-
session had been yielded to the government. The task
of the Commission was not exhausted, however, when it
ascertained the allowance to be made for the cost of main-
tenance. It was to require the restatement of other oper-
ating expenses in addition to those for maintenance " to
the extent necessary to correct and exclude any dispropor-
tionate or unreasonable charge to such expenses " for the
guaranty period, or any charge " which under a proper
system of accounting is attributable to another period."
Transportation Act, § 209f (5).

A task so vast and intricate exacted time and study.
Many of the carriers, however, including this respondent,
were in urgent need of cash for pressing obligations.
The statute contained provisions that were intended to
relieve the pressure. By § 209 (h) the Commission was
empowered, upon application during the guaranty period,
to issue certificates for advance payments, such advances
to be not in excess of the " estimated amount " necessary
to make good the guaranty. The Secretary of the
Treasury was directed to make the advances in the
amounts specified in the certificate upon the execution
by the carrier of a contract, " secured in such manner as

the Secretary may determine," that upon final determination of the amount of the guaranty it would repay the excess payment with interest, if excess there should be found to be. Under the authority of that section, certificates in the amount of $6,500,000 were issued by the Commission and collected by the carrier. The payments thus received were well within the limit of the guaranty as finally determined and as to these no claim for reimbursement is put forward by the government.

The relief permissible under § 209 (h) turned out to be inadequate. It was limited to applications made before the guaranty period had expired, to applications, that is to say, before September 1, 1920. In the case of the respondent, as in that of other carriers, the guaranty period expired with the Commission still unready to announce its ultimate award, and with the pressure of the need for intermediate relief as urgent as before. Accordingly, the Transportation Act, 1920, was amended on February 26, 1921, by authorizing the Commission, if not at the time able finally to determine the whole amount due, to make its certificate for any amount definitely ascertained by it to be due, and thereafter in the same manner to make further certificates, until the whole amount due had been certified. Act of February 26, 1921, c. 72, 41 Stat. 1145, § 212; 49 U. S. C., § 79. The text of the statute is quoted in the margin.*

---

* "Sec. 212. (a) In making certifications under section 204 or section 209, the Commission, if not at the time able finally to determine the whole amount due under such section to a carrier or the American Railway Express Company, may make its certificate for any amount definitely ascertained by it to be due, and may thereafter in the same manner make further certificates, until the whole amount due has been certified. The authority of and direction to the Secretary of the Treasury under such sections to draw warrants is hereby made applicable to each such certificate. Warrants drawn pursuant to this section, whether in partial payment or in final payment, shall be paid: (1) If for a payment in respect to reimbursement of a carrier for a

At the time of the enactment of that section, the respondent had already filed with the Commission a guaranty claim in the sum of $18,498,391.67, of which $6,500,000 had already been paid through certificates issued under § 209 (h), leaving a balance of $11,998,391.67 still claimed to be due. The respondent, in submitting this claim, gave notice that it required a $6,000,000 advance to meet a pressing obligation, and asked for a certificate to that extent to be used as a basis for credit upon an application for a bank loan. Such a certificate was issued on February 23, 1921, though the Commission and the carrier understood that under the statute then in force it could not be made the basis for a payment by the Secretary of the Treasury. Three days later § 212 was added to the Transportation Act, and the legal aspect of the situation was at once transformed. At the respondent's request, the Commission cancelled its advisory certificate of February 23, 1921, and on March 1, 1921, issued a new certificate under the authority of the statute. "The Commission has ascertained and hereby certifies to the Secretary of the Treasury that the amount of six million dollars ($6,000,000) in addition to

deficit during the period of federal control, out of the appropriation made by section 204; (2) if for a payment in respect to the guaranty to a carrier other than the American Railway Express Company, out of the appropriation made by subdivision (g) of section 209; and (3) if for a payment in respect to the guaranty to the American Railway Express Company, out of the appropriation made by the fifth paragraph of subdivision (i) of section 209.

"(b) In ascertaining the several amounts payable under either of such sections, the Commission is authorized, in the case of deferred debits and credits which can not at the time be definitely determined, to make, whenever in its judgment practicable, a reasonable estimate of the net effect of any such items, and, when agreed to by the carrier or express company, to use such estimate as a definitely ascertained amount in certifying amounts payable under either of such sections, and such estimates so agreed to shall be prima facie but not conclusive evidence of their correctness in amount in final settlement."

any sum or sums heretofore certified in favor of the carrier under § 209 of the Transportation Act, 1920, is necessary to make good to said carrier the guaranty provided by the said section. The Commission hereby certifies that such amount of six million dollars ($6,000,000) cannot be reduced by further accounting or otherwise," with which was coupled a statement that additional amounts might be found to be owing on further investigation.

The respondent, armed with this certificate, procured from the Treasury the $6,000,000 required for its present needs. This amount added to the earlier payments of $6,500,000, makes up a total of $12,500,000 collected on account of its claim against the government. The total was nearly $6,000,000 less than the amount claimed by the respondent to be ultimately due. It was about $3,200,000 less than the estimate of the final payment submitted as a basis for the certificate in a report to the Commission by the Bureau of Finance. Whatever the final payment might afterwards be found to be, the sum certified to be due left or seemed to leave a margin of error ample enough for any change within the zone of reasonable expectation.

The Commission, after satisfying thus the instant needs of the respondent, continued the investigations necessary to ascertain the final balance. Not till five years had passed was it ready to announce its findings. In the meantime it had filed a series of reports or decisions defining or revising the principles and formulae that were to govern it thereafter in the allowance or disallowance of expenditures for maintenance. See, e. g., Maintenance Expenses under § 209, 70 I. C. C. 115; In the matter of Final Settlement under § 209 of the Transportation Act, 1920, 70 I. C. C. 711. By its final certificate issued on June 8, 1926, under § 209 (g), it certified that the total amount necessary to make good the guaranty was

$11,170,214.02, which was less by $1,329,786.98 than the payments already made. Cf. *Great Northern Ry. Co.* v. *United States,* 277 U. S. 172. For the recovery of the difference with interest this action was brought.

We may assume in favor of the petitioner that a certificate issued by the Commission under § 212 of the statute is open to impeachment for fraud or mistake, and that payments burdened with those infirmities are subject to be reclaimed. If this be assumed, it does not avail without more to lay a duty of restitution upon the carrier before us. Fraud in the making of the certificate is neither proved nor even intimated. Mistake also there was none, but merely a revision of judgment in respect of matters of opinion. The respondent reported that it had paid out for maintenance during the guaranty period $28,982,000. There is no claim that this report was false even to a penny. Readjustments were needed, however, as we have already pointed out, whereby allowance might be made for fluctuations in the cost of labor and material, as well as for other economic changes, between the period of test and the period of guaranty. The formulae for the readjustment of maintenance expenditures in use by the Commission on March 1, 1921, reduced the maintenance allowance to $27,233,000, which was more than one and a half million dollars less than the expenditures actually made. The formulae in use on June 8, 1926, reduced the allowance for maintenance to $23,815,000. In this last reduction lies the explanation of the discrepancy between the partial certificate and the final one. Neither set of formulae is an expression of mathematical truth in such a sense that accuracy may be affirmed of one and error of the other. Each makes it necessary to multiply the expenses of the test period by a factor derived from an imperfect and approximate estimate of a composite change of prices. To what extent the factor is an expression of mere opinion is perceived when the process back of it is

considered. At the date of the partial certificate various items of expense during the years of the test period—the cost of locomotives, of cars, of tracks, and many others—were separately considered, and the proper percentages of increase during the period of the guaranty applied separately to each of them. At the date of the final certificate, the Commission determined to abandon these refinements. It joined together all the property of all the carriers in regional or territorial groups, and ascertained the factor of increase for the members of a group collectively. By the use of this method, the test period expense was to be " multiplied by a factor representing the increase in 'the general level of cost of labor and material for the territories in which the lines of railroad of the carrier are situated." A general equation factor was substituted for a series of factors separately computed and separately applied. The result, as the Commission concedes in its report, is at best an approximation representing an exercise of judgment as to the effect of a composite increase. What is thus conceded in the report as to the source of the discrepancy between the two certificates was confirmed upon the trial by the testimony of a witness for the government. The difference, he tells us, " grew out of a difference of opinion as to the method of calculation rather than out of errors in the figures submitted." The Commission has not said that in any particular case the general equation factor will yield results more accurate than those attained by the method theretofore in use. It has claimed no more for the new method than an enhancement of simplicity along with an approach to accuracy not inferior to that of the method displaced.

In these circumtances we find no basis for a holding that the payment made to the respondent under the partial certificate of March 1, 1921, was due to any mistake of fact, either unilateral or mutual. *United States* v. *Barlow*, 132 U. S. 271, 280, 281. Cf. *Gordon* v. *Butler*,

105 U. S. 553, 557, 558. The officials of the government knew precisely what they were doing, and kept well within the statute defining their authority. They did not act illegally like the officials whose acts were challenged in the cases cited by the petitioner. *Wisconsin Central R. Co.* v. *United States,* 164 U. S. 190; *Grand Trunk Western Ry. Co.* v. *United States,* 252 U. S. 112; *Burnet* v. *Porter,* 283 U. S. 230. Charged with a difficult task exacting judgment and discretion, they came to a decision in good faith with knowledge of the relevant facts and without departure from the law. If the payment under their certificate is to be reclaimed, some other ground than mistake or illegality must be found to sustain the reclamation.

Mistake and illegality being thus excluded from the reckoning, we are brought to a second ground for reclamation put forward by the government. The argument is made that by the true construction of the statute, a certificate issued by the Commission under § 212 is provisional and tentative; that upon the issuing of a final certificate of inconsistent tenor, it is superseded and nullified as to the past as well as to the future; and that payments made under its authority, though legal in the making, become illegal by retroaction. We do not so interpret the meaning of the statute. If all that the lawmakers had in view was to authorize mere advances on the basis of an estimate, the carrier remaining bound to refund the excess in the event that the estimate was thereafter found to be too high, a suitable form was at hand in § 209 (h) for the expression of their purpose. All that was necessary was to strike out the requirement that application must be made during the guaranty period, and to provide that the promise of the carrier to refund might be accepted without security. Section 209 (h), thus reframed, would have given expression with nicety to the obligation which the respondent is said to have assumed.

But § 212, as enacted, was drafted upon different lines. By subdivision *a* of the section, the Commission, if unable finally to determine the whole amount due, may make its certificate for any amount definitely ascertained by it to be due, with supplemental certificates from time to time thereafter. No longer does the statute speak, as it had spoken in § 209 (h), of "estimated amounts," and of contracts to refund any excess in the "advances." The newly authorized certificates are to represent what has been "definitely ascertained"; and moneys procured thereby are characterized no longer as "advances," but as partial or final payments. If, however, the meaning of subdivision *a* could conceivably be doubtful when considered by itself, the doubt is removed by subdivision *b*. The lawmakers foresaw that there might be "deferred debits and credits," such as unsettled damage claims, which could not be fully ascertained till a long time had gone by. Accordingly, subdivision *b* provides that the Commission shall be "authorized, in the case of deferred debits and credits which cannot at the time be definitely determined, to make, whenever in its judgment practicable, a reasonable estimate of the net effect of any such items," the estimates so made to be "prima facie but not conclusive evidence of their correctness in the event of final settlement." The petitioners would have us hold that subdivisions *a* and *b*, parts of a single section, mean one and the same thing with all their differences of form. The contrast between them is too pointed to permit us to find identity of thought lurking dormant and concealed beneath this diversity of phrase.

Thus far we have not traveled, in our search for the meaning of the lawmakers, beyond the borders of the statute. In aid of the process of construction we are at liberty, if the meaning be uncertain, to have recourse to the legislative history of the measure and the statements by those in charge of it during its consideration by the

Congress. *United States* v. *Missouri Pacific R. Co.*, 278 U. S. 269, 278. If such recourse be had, there is confirmation of the view that the certificates were more than estimates of provisional advances. Subdivisions *a* and *b*, as originally introduced, drew no distinction as to the effect of payments made thereunder, the certificates being as conclusive under the one as under the other. A proposed amendment to modify subdivision *b* by making the effect of such certificates prima facie, but not conclusive, was carried. 60 Cong. Rec., pt. 3, pp. 2815, 2816. A separate proposed amendment to modify subdivision *a* in substantially the same way was rejected. 60 Cong. Rec., pt. 3, pp. 2812, 2815. In the discussion of these amendments, the inquiry was pressed whether the government would be helpless if the certificates were too high. The answer was emphatic that the certificates were final. 60 Cong. Rec., pt. 3, pp. 2739, 2802, 2803, 2809, 2812, 2813.

A word of answer is still due to the argument of the government that the certificate is void because the work of the commission was so hasty and imperfect as to involve an abdication of its statutory duty. Without probing at this time the legal implications of this argument, we find it without adequate basis in the facts. Whatever basis it has is in the testimony of an accountant in the service of the Commission. His conclusions are contradicted by evidence, direct and circumstantial, offered by the carrier, and contradicted also by the recitals of his superior's certificate. The record may permit an inference that the whole amount owing in order to discharge the guaranty had not been so definitely determined as to make the Commission willing to recommend a settlement in full, though even this may be uncertain. It does not command a holding that the margin of error was so inscrutable as to preclude the definitive approval of a payment on account.

*Affirmed.*