## NORTHERN PAC. RY. CO. v. UNITED STATES.

### No. 42253.

Court of Claims.
March 1, 1937.

Dennis F. Lyons, of St. Paul, Minn. (McKenney, Flannery & Craighill, of Washington, D. C., and Charles W. Bunn and M. L. Countryman, Jr., both of St. Paul, Minn., on the brief), for plaintiff.

William W. Scott and Louis R. Mehlinger, both of Washington, D. C., and James W. Morris, Asst. Atty. Gen. (George C. Sweeney, Asst. Atty. Gen., on the brief), for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

WILLIAMS, Judge.

Plaintiff, the Northern Pacific Railway Company, prior to March, 1920, was operated by the Director General of Railroads under the provisions of the act of March 21, 1918 (40 Stat. 5451), commonly known as the Federal Control Act. By agreement between plaintiff and the Director General the annual compensation paid plaintiff during the period of federal control was fixed at $30,130,068.81.

Upon the termination of federal control plaintiff accepted the provisions of section 209 of the act of February 28, 1920 (41 Stat. 456, 464, 49 U.S.C.A. § 77), known as the Transportation Act, by which the United States guaranteed to plaintiff for a period of six months from March 1, 1920, an operating income of not less than one-half of the amount named in the contract between plaintiff and the Director General as compensation for the use of its property during the period of federal control, plus one-half the increase of such compensation provided for in section 4 of the Federal Control Act (40 Stat. 454) with respect to additions and betterments made while plaintiff's property was under federal control. The Interstate Commerce Commission under the terms of the Transportation Act was charged with the duty of ascertaining and certifying to the Secretary of the Treasury the amounts necessary to make good the guaranty to carriers accepting the provisions of section 209 of the act. This duty was a most exacting one, and one that required several years in its performance.

By section 209 (h) (41 Stat. 466) the Commission was empowered, upon application during the guaranty period, to issue certificates for advance payments, such advances to be not in excess of the "estimated amount" necessary to make good the guaranty. The Secretary of the Treasury was directed to make the advances in the amounts specified in the certificate upon the execution by the carrier of a contract, "secured in such manner as the Secretary may determine," that upon final determination of the amount of the guaranty it would repay the excess payment with interest, if excess there should be found to be. The plaintiff under the authority of this section made application for and the Commission issued a certificate to the Secretary of the Treasury authorizing an advance of $5,000,000, which was received by plaintiff, after it had entered into a contract with the Secretary of the Treasury, by the terms of

which plaintiff agreed to repay to the United States upon final determination by the Interstate Commerce Commission of the amount of the guaranty to which it was entitled any excess in the advance of $5,000,000 over and above the amount finally determined to be due, and as security for the repayment of such excess deposited with the Secretary $1,250,000 par value of Liberty bonds.

The advances provided under section 209 (h) being available to carriers only where the application for advances was made during the six months' guaranty period, and the Commission not being able at the end of the six months' guaranty period to certify the amounts due the various carriers, many of which being in dire need for operating funds, Congress on February 26, 1921, 41 Stat. 1145 (49 U.S.C.A. § 79),[1] amended the Transportation Act by authorizing the Commission, if not at the time able finally to determine the whole amount due, to make its certificate for any amount definitely ascertained by it to be due, and thereafter in the same manner to make further certificates, until the whole amount due had been certified. Payments made to carriers under this amendatory provision are known as partial payments as distinguished from the advances authorized under section 209 (h).

Plaintiff in its verified claim filed pursuant to the order of the Commission claimed that there was due it under the warranty of section 209 of the Transportation Act the sum of $16,751,753.80. While this claim was under investigation by the Commission plaintiff made an application for a partial payment of the amount due it in the sum of $10,000,000. The Commission's Bureau of Finance, to which plaintiff's application was referred for investigation and recommendation, made a report to Division 4 of the Commission, then considering plaintiff's claim, recommending a partial payment of $7,-000,000. The report of the Bureau of Finance, so far as here pertinent, stated:

| | |
|---|---|
| Total amount claimed by carrier...... | $16,751,753.80 |
| Adjustments | |
| Amount claimed for increase in compensation due to accounting errors... | 121,532.79 |
| Amount allowed ...................... | 68,120.00 |
| Deduction ........................... | 53,412.79 |
| Maintenance of Way and Structures: | |
| Amount claimed ...................... | $12,105,844.93 |
| Amount allowed ...................... | 11,803,421.11 |
| Deduction ........................... | 302,423.82 |
| Maintenance of Equipment: | |
| Amount claimed ...................... | 13,786,195.81 |
| Amount allowed ...................... | 12,117,283.46 |
| Deduction ........................... | 1,668,912.35 |
| Total deductions .................... | 2,024,748.84 |
| Ascertained amount necessary to make good guaranty ........................ | 14,727,004.84 |
| Advances certified to February 28, 1921 | 5,000,000.00 |
| Balance ascertained to be due carrier ................................ | 9,727,004.84 |

Division 4 of the Commission approved the recommendation of its Bureau of Finance and on March 3, 1921, issued to the Secretary of the Treasury its certificate for partial payment in the sum of $7,000,000, the certificate reading in part as follows: "The Commission is not at this time able finally to determine the whole amount due under said section 209 to said carrier, but has definitely ascertained and hereby certifies to the Secretary of the Treasury that the amount of seven million dollars ($7,000,000), in addition to any other sum or sums heretofore certified in favor of the carrier, is due to said carrier under section 209 of the Transportation Act, 1920."

Division 4 of the Commission, on June 17, 1925, filed its final report in respect to the guaranty settlement with the plaintiff and affiliated companies, in which report it was held that the amount necessary to make good the guaranty to plaintiff under section 209 of the Transporta-

---

[1] "Sec. 212. (a) In making certifications under section 204 or section 209 [section 73 or section 77]; the commission, if not at the time able finally to determine the whole amount due under such section to a carrier [or the American Railway Express Company], may make its certificate for any amount definitely ascertained by it to be due, and may thereafter in the same manner make further certificates, until the whole amount due has been certified. The authority of and direction to the Secretary of the Treasury under such sections to draw warrants is [hereby] made applicable to each such certificate. Warrants drawn pursuant to this section, whether in partial payment or in final payment, shall be paid."

tion Act was $10,679,758.27,· and that after making adjustments on account of guaranties to certain affiliated companies, the amount necessary to make good the guaranty to plaintiff was $10,905,094.80 which was $1,269,905.20 less than the amount already received by plaintiff. Upon the application of plaintiff a rehearing was granted before the entire Commission. At this hearing plaintiff, among other things, argued that the certificate of March 3, 1921, authorizing the partial payment ·of $7,000,000 was a final determination and that the only question left open was what, if any, additional amount should be certified over and above the sum of $12,000,000. This contention was rejected by the Commission, the Commission holding: "This carrier, like the Great Northern Railway Company, contends that we are without power to question the correctness of our certificates issued under authority of section 212, for the reason that the section authorizes only the certification of such amounts as are 'definitely ascertained' to be due. In our report in Guaranty Settlement with Great Northern Railway Company and Affiliated Companies, supra, we said that this contention, in our opinion, is based upon a misconception of the purpose of the certificates provided for by section 212. These certificates, like those issued under section 209, are issued to the Secretary of the Treasury and not to the carriers to be benefited. Their apparent purpose is to protect the Treasury Department in its disbursement of Government funds, and there is no apparent intent on the part of Congress to vest .the carriers with any rights under the certificates which are different from the rights given them by the section as a whole. Final conclusions as to the rules to be applied in arriving at maintenance allowances for the guaranty period were not reached until several months after the partial payments above mentioned were certified. The carrier's necessities did not permit delay of the payments until the amounts due could have been definitely ascertained in the strict sense now insisted upon by the carrier. Nor do we construe the law as foreclosing a proper adjustment of the amount payable under the guaranty to this carrier to the same basis as that adopted for the general administration of the section."

The full Commission unanimously upheld the report and findings previously made by Division 4 of the Commission, and on July 24, 1926, issued to the Secretary of the Treasury its corrected certificate showing that plaintiff was indebted to the United States in the sum of $1,320,241.73.

The Secretary of the Treasury repeatedly demanded payment by plaintiff of the sum of $1,320,241.73 with interest, which payment plaintiff consistently refused to make, contending at all times that it was not indebted to the United States in the amount claimed. Finally, however, on January 18, 1928, after various transactions detailed in the findings of fact, which will subsequently be discussed, plaintiff's counsel, in a letter, tendered to the Secretary of the Treasury on behalf of plaintiff two checks aggregating $1,320,241.73, representing the principal amount claimed to be due the United States on account of the alleged overpayment of the amount plaintiff was entitled to receive under section 209 of the Transportation Act, and subsequently paid to the Secretary of the Treasury $201,455.20 as interest on the principal sum, making a total of $1,521,696.93.

Plaintiff brings this suit to recover the sum of $1,521,696.93 thus paid to the Secretary of the Treasury on account of its alleged indebtedness to the United States, contending that the facts and circumstances under which the payment was made by plaintiff and accepted by the Secretary of the Treasury raised an implied contract on the part of the defendant to repay the said amount if upon a final determination of the controversy it was decided that plaintiff was not indebted to the United States as claimed by the defendant.

The decision of the Supreme Court in United States v. Great Northern Railway Co., 287 U.S. 144, 53 S.Ct. 28, 30, 77 L.Ed. 223, definitely determines that plaintiff under the facts here shown was not indebted to the United States in the amount claimed. The Great Northern Railway Company, like plaintiff, was operated by the Director General of Railroads under the period of federal control, and, like plaintiff, upon the return of its property at the termination of federal control, accepted the guaranty provisions

of section 209 of the Transportation Act. The Great Northern Railway Company filed a guaranty claim in the sum of $18,498,391.67. It received an advance through certificates issued under section 209 (h) of $6,500,000 and a partial payment of $6,000,000 through a certificate issued under section 212 of the Transportation Act as amended. The final report of the Interstate Commerce Commission of the amount necessary to make good the guaranty fixed the amount at $11,170,214.02, and the Commission issued its certificate to the Secretary of the Treasury showing that the Railway Company had been overpaid $1,329,786.98 by reason of the advances and partial payments it had received. As here, the Secretary of the Treasury made a demand upon the Railway Company for the overpayment thus certified, which the company refused to make. The government thereupon instituted suit in the District Court of the United States seeking to recover the amount of the certified overpayment. The Supreme Court, in deciding that the government could not recover, said:

"We may assume in favor of the petitioner that a certificate issued by the Commission under section 212 of the statute is open to impeachment for fraud or mistake, and that payments burdened with those infirmities are subject to be reclaimed. * * * Fraud in the making of the certificate is neither proved nor even intimated. Mistake also there was none, but merely a revision of judgment in respect of matters of opinion. * * *

"The argument is made that, by the true construction of the statute, a certificate issued by the Commission under section 212 is provisional and tentative; that, upon the issuing of a final certificate of inconsistent tenor, it is superseded and nullified as to the past as well as to the future; and that payments made under its authority, though legal in the making, become illegal by retroaction. We do not so interpret the meaning of the statute. If all that the lawmakers had in view was to authorize mere advances on the basis of an estimate, the carrier remaining bound to refund the excess in the event that the estimate was thereafter found to be too high, a suitable form was at hand in section 209 (h) for the expression of their purpose. All that was necessary was to strike out the requirement that application must be made during the guaranty period, and to provide that the promise of the carrier to refund might be accepted without security. Section 209 (h), thus reframed, would have given expression with nicety to the obligation which the respondent is said to have assumed. But section 212, as enacted, was drafted upon different lines. By subdivision a of the section, the Commission, if unable finally to determine the whole amount due, may make its certificate for any amount definitely ascertained by it to be due, with supplemental certificates from time to time thereafter. No longer does the statute speak, as it had spoken in section 209 (h), of 'estimated amounts,' and of contracts to refund any excess in the 'advances.' The newly authorized certificates are to represent what has been 'definitely ascertained'; and moneys procured thereby are characterized no longer as 'advances,' but as partial or final payments. * * *

"In aid of the process of construction we are at liberty, if the meaning be uncertain, to have recourse to the legislative history of the measure and the statements by those in charge of it during its consideration by the Congress. * * * In the discussion of these amendments, the inquiry was pressed whether the government would be helpless if the certificates were too high. The answer was emphatic that the certificates were final. 60 Congressional Record, part 3, pages 2739, 2802, 2803, 2809, 2812, 2813."

■ The defendant contends that the certificate of March 3, 1921, for the partial payment of $7,000,000 was issued through a mistake of fact. In its answer to the petition filed May 29, 1934, after the taking of the testimony had been completed, the defendant said: "That by reason of the incomplete and erroneous statements made in plaintiff's said return of February 7, 1921, which statements were based upon information known only to plaintiff, the Commission was led to believe, and did believe, that after its certification of a partial payment of $7,000,000 on March 3, 1921, there would be left a margin or balance due the plaintiff over and above the $5,000,000 previously advanced under section 209, which margin with $1,250,000 of Government bonds already pledged by plaintiff to secure any

overpayment of the guaranty would be ample to protect the Government against any overpayment; and that if the claim filed on that date had been in the amount to which it was subsequently reduced by plaintiff, the amount certified as a partial payment would have been reduced by the Commission by an amount at least equal to the amount of the guaranty that was finally determined to have been overpaid to plaintiff."

The amount claimed by plaintiff in its verified claim of February 7, 1921, was $16,751,753.80. This claim was filed pursuant to the Commission's order of October 18, 1920, in which no formula was prescribed for making an adjustment for maintenance expenses but carriers were advised to submit for consideration such data with respect to these adjustments as were deemed proper. In preparing its claim for maintenance, plaintiff, as did other carriers, followed what were known as the railway executives' formulæ, with which the Commission was familiar. There is nothing in the record to support the contention that plaintiff's claim was incomplete in any respect, and it is not shown wherein it contained erroneous statements. So far as the record shows, it was prepared and filed in strict conformity with the directions and orders of the Commission theretofore issued. The discrepancy between the partial payment certificate of March 3, 1921, and the final certificate of June 8, 1926, was not occasioned by reason of incomplete and erroneous statements in plaintiff's claim of February 7, 1921, but because of the fact that the Commission in issuing its final certificate used a revised and different set of principles and formulæ, in arriving at the amount required to make good the guaranty under section 209, than had been used by it when the partial payment certificate was issued. In passing upon this precise question the court, in United States v. Great Northern Railway Co., supra, said: "Neither set of formulæ is an expression of mathematical truth in such a sense that accuracy may be affirmed of one and error of the other. Each makes

it necessary to multiply the expenses of the test period by a factor derived from an imperfect and approximate estimate of a composite change of prices. To what extent the factor is an expression of mere opinion is perceived when the process back of it is considered."

The court, after pointing out the difference between the formulæ used by the Commission when the partial payment certificate was issued and those applied by the Commission when the final certificate was issued, stated: "In these circumstances we find no basis for a holding that the payment made to the respondent under the partial certificate of March 1, 1921, was due to any mistake of fact, either unilateral or mutual. United States v. Barlow, 132 U.S. 271, 280, 281, 10 S. Ct. 77, 33 L.Ed. 346. Cf. Gordon v. Butler, 105 U.S. 553, 557, 558, 26 L.Ed. 1166."

What was said by the court in the Great Northern Case is fully applicable to the instant case, the facts in the two cases being precisely the same, and it must be held, as there, that "mistake also there was none, but merely a revision of judgment in respect of matters of opinion."

In view of the fact the partial payment certificate for $7,000,000 was not issued through a mistake of fact, the defendant's contention that the Commission was induced to issue the certificate through misplaced confidence in plaintiff's representatives, and the assurance given by plaintiff's comptroller that if payment of said amount was made the government would be protected not only by the balance of the amount claimed by plaintiff to be due it, but also by the Liberty bonds then on deposit as security against any excess in the advance payment of $5,000,000, becomes unimportant and need not be discussed. In justice to the Commission, however, it should be stated that the contention is not supported by any competent proof.

The defendant contends that plaintiff's suit is not based on any of the various causes of action specified in section 145 of the Judicial Code, 28 U.S.C.A. § 250 [2] defin-

---

[2] Section 145, Judicial Code: "All claims (except for pensions) founded upon the Constitution of the United States or any law of Congress, upon any regulation of an executive department, upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable."

ing the jurisdiction of this court, and that hence the court is without jurisdiction to hear and determine the same. It is contended that the suit is not founded upon a law of Congress because sections 209 and 212 of the Transportation Act confer upon plaintiff no right of action against the United States in this or any other court. It is further contended that plaintiff made payment of the moneys sought to be recovered under the provisions of the contract entered into between plaintiff and the Comptroller General of the United States on May 31, 1927, and that since the contract required that plaintiff make the payment no implied contract in fact arose or could arise on the part of the defendant to refund it.

Plaintiff, as we have seen, received an advance payment of $5,000,000 on August 14, 1920, and as required by section 209 (h) entered into a contract with the Secretary of the Treasury by the terms of which it agreed to repay to the United States upon the final determination by the Interstate Commerce Commission of the amount of the guaranty to which it was entitled, any excess in said advance over and above the amount finally determined to be due, and as security for the repayment of such excess pledged Liberty bonds of the par value of $1,250,000. That the advance payment of $5,000,000 was not in excess of the amount due plaintiff under the guaranty was definitely determined by the Commission when it issued its certificate for the partial payment in the amount of $7,000,000 on March 3, 1921, and plaintiff at that time became entitled to have the bonds returned to it. The Secretary, however, did not return the bonds but continued to hold them and was in possession of them when the Commission in its final report held that there had been an overpayment to plaintiff of $1,269,905.20 and issued its certificate to the Secretary that that amount was due from plaintiff to the United States. Upon the refusal of plaintiff to pay the amount of the indebtedness certified against it by the Commission the Secretary, in September, 1925, commenced to withhold the interest due plaintiff on the $1,250,000 bonds deposited as security for repayment of any excess in the advance payment of $5,000,000, claiming the right to hold such bonds and interest due thereon as security for repayment of the amount of the alleged indebtedness demanded by him from plain-

tiff. In addition to this the Comptroller General of the United States, in October, 1925, advised plaintiff in writing that he would withhold payment of all amounts due from the United States to plaintiff on account of mail, freight, passenger transportation, and other earnings, pending the liquidation or satisfaction of the alleged indebtedness. Thereafter, the Comptroller General proceeded to withhold amounts admittedly due plaintiff until the sums so withheld amounted, on May 31, 1926, to $1,598,000. These sums were released by the Comptroller General without explanation in June 1926. However, in October, 1926, the Comptroller again began withholding sums due plaintiff for the transportation of mail, freight, passenger service, etc., amounting on May 31, 1927, to $1,696,000, on which date the Secretary was also retaining the bonds with accrued interest amounting to $1,280,000. The law (18 Stat. 481, 47 Stat. 1516, Title 31, U.S.C., § 227, 31 U.S.C.A. § 227) that vested the Comptroller General with authority to withhold from amounts admittedly due plaintiff an amount equal to the debt claimed to be due from plaintiff to the United States, also required the Comptroller General, plaintiff denying the indebtedness, to cause legal proceedings to be immediately commenced to enforce such indebtedness and cause the same to be prosecuted to final judgment with all reasonable despatch. Notwithstanding the fact that the plaintiff at all times denied that it was indebted to the United States in the amount claimed and protested the withholding of its current earnings as an offset against the alleged indebtedness, the Comptroller General failed to institute proceedings to enforce the claim of the government, although he had twice withheld more than sufficient moneys due plaintiff to discharge the claimed indebtedness, with interest. Had the Comptroller General followed the plain provisions of the statute and instituted suit to enforce the claim of the government the rights of the parties would have been promptly settled in plaintiff's favor, under the rule subsequently laid down in United States v. Great Northern Ry. Co., supra.

Plaintiff in November, 1926, brought an action against the Interstate Commerce Commission in the Supreme Court of the District of Columbia seeking a common-law writ of certiorari to review the rec-

ord and proceedings before the Interstate Commerce Commission and to determine whether the "Commission had authority to make the final certificates of June 17, 1925, and July 24, 1926. The court, on May 4, 1927, granted the defendant's motion to dismiss the suit on the ground that the court was without jurisdiction to entertain it, and on May 9, 1927, plaintiff appealed from this order and judgment to the Court of Appeals for the District of Columbia. While the appeal was pending plaintiff and the Comptroller General, on May 31, 1927, entered into the contract under which the defendant says plaintiff paid the principal sum of $1,320,241.73 and interest in the sum of $201,455.20, to the Secretary of the Treasury. At the time the contract was entered into the Secretary of the Treasury was still holding the Liberty bonds of plaintiff in the sum of $1,250,000 and accrued interest in the amount of $30,000, and the Comptroller General had withheld from plaintiff sums due it for the transportation of mail, freight, and passenger service, etc., of more than $1,696,000 and was continuing to withhold such current earnings as they became due.

The contract first recites the facts that the United States have asserted a claim against plaintiff in the sum of $1,320,241.-73; that the plaintiff denies liability and has instituted in the Supreme Court of the District of Columbia a suit to test the validity of said claim; and that the Comptroller General is withholding from plaintiff payments due it from mail, freight, and passenger transportation. Then follow these provisions:

"Now, therefore, in order that such payments due the railway company for transportation of mail, freight, and passengers may not longer be withheld from the railway company, it is agreed and stipulated between the parties hereto as follows:

"The railway company shall cause to be deposited with the Comptroller General interest-bearing Government securities in the principal sum of $1,500,000 and thereupon, as and when any sums shall be ascertained and allowed and become payable through the General Accounting Office (the Comptroller General), to the railway company, payments thereof shall forthwith be made to the railway company and not be withheld because of the claim of the United States. * * *

"The Government securities deposited pursuant to this agreement shall be held by the Comptroller General in the safekeeping of said Treasurer as aforesaid, pending the final determination of the claim of the United States. * * *

"For the purpose of the agreement (1) the claim of the United States shall be deemed to have been finally determined, or a final determination thereof made, when it shall have been decided by the court of last resort having jurisdiction thereof or shall have been settled by an agreement in writing between the parties thereto. * * *

"The Government securities deposited hereunder shall remain on deposit for the purpose of this agreement, anything herein contained to the contrary notwithstanding, and the railway company agrees that it will not bring any suit or action for the recovery or redelivery to the railway company of said securities or of any of them or any of the proceeds thereof prior or to the final determination of the claim of the United States, saving and excepting the aforesaid action now pending and/or any other suit or action which may be necessary to determine the validity of said claim."

Following the making of the contract the Court of Appeals for the District of Columbia, on November 7, 1927, Northern Pacific R. Co. v. Interstate Commerce Commission, 57 App.D.C. 318, 23 F.(2d) 221, affirmed the decision of the District Court in dismissing the certiorari proceeding brought by plaintiff, and on January 3, 1928, the Supreme Court denied certiorari. 275 U.S. 572, 48 S.Ct. 205, 72 L. Ed. 433.

The denial of plaintiff's petition for a common-law writ of certiorari by the Supreme Court of the District of Columbia on the ground of want of jurisdiction to entertain it, the affirmation of the District Court's action by the Court of Appeals for the District of Columbia, and the denial of the application for certiorari by the Supreme Court determined nothing as to the merits of the government's claim against plaintiff, and is not res adjudicata. As stated by the court in United States v. Carver, 260 U.S. 482, 43 S. St. 181, 182, 67 L.Ed. 361, "The denial of a writ of certiorari imports no expression of opinion upon the merits of the case."

The contract of May 31, 1927, obligated plaintiff to pay the amount demanded by the government as an overpayment of the amount of the guaranty due plaintiff under section 209 of the Transportation Act only when it had been finally determined by the court of last resort having jurisdiction thereof that plaintiff owed the government the amount claimed, and the securities of the value of $1,500,000 pledged under the contract could be sold and the proceeds thereof credited against the government's claim only in the event plaintiff within thirty days following such determination in favor of the government failed to pay the amount determined to be due the United States. That the parties to the contract contemplated that suits other than the certiorari proceedings then pending might be necessary to a final determination of the claim of the United States is clearly shown in the provision binding plaintiff not to bring any suit or action for the recovery or redelivery to plaintiff of the securities deposited under the contract prior to the final determination of the claim of the United States "saving and excepting the aforesaid action now pending and/or any other suit or action which may be necessary to determine the validity of said claim." The question as to whether the government's claim against plaintiff was valid or invalid had not been determined when plaintiff made the payments involved and was not determined until four years later when the Supreme Court in the decision in the Great Northern Railway Co. Case held that the government could not recover on a like claim against that company. Hence the payments sought to be recovered were not, at the time they were made, required of plaintiff under the contract of May 31, 1927, as contended by the defendant.

When the proceedings brought by plaintiff in the Supreme Court of the District of Columbia came to an end through denial of certiorari by the Supreme Court of the United States, plaintiff was placed in a difficult position. It had consistently contended that it did not owe the government the amount demanded. It had insisted from the beginning that the partial payment certificate for $7,000,000 was a definite ascertainment by the Commission that that amount was due plaintiff, and that the certificate was final and conclusive. It had protested the illegal ac-

tion of the Secretary of the Treasury in refusing to return the $1,250,000 in Liberty bonds deposited with him. It had protested the action of the Comptroller General in withholding moneys admittedly due it for services rendered which, at the time the contract of May 31, 1927, was entered into, was far in excess of the government's claim, plus interest. It had accomplished nothing in the certiorari proceedings and now found itself facing the government's demand for payment of the claim, with the question as to the finality of the partial payment certificate still unsettled. It had deposited with the Comptroller General under the contract of May 31, 1927, securities of the value of $1,500,000, possession of which it could not recover until the claim of the government had finally been determined in plaintiff's favor. The Comptroller General had refused to institute proceedings by which the legality of the government's claim could have been determined, although the law expressly laid that duty upon him, and there was apparently no prospect for an early settlement of the question. If it was finally determined that the claim was valid, interest was piling up at the rate of $200 a day. In these circumstances plaintiff was advised by its Washington counsel to pay, under protest, the amount demanded by the government and bring suit in this court to recover. This seemed at the time to be the only course open to plaintiff and it was followed. Accordingly, on January 18, 1928, plaintiff's Washington counsel wrote the Secretary of the Treasury, inclosing two checks for the principal amount due, saying that he tendered the money on behalf of plaintiff involuntarily and without admitting the legality of the claim of the United States. Plaintiff's counsel stated in the letter:

"Under an agreement made in March 1927 between said railway company and the United States, through the Comptroller General, the railway company agreed that it would pay the amount claimed by the Government within thirty days after "the final determination of the claim of the United States", if in its favor. On January 3rd last, the Supreme Court of the United States denied the petition of the railway company for a writ of certiorari to review the judgment of the Court of Appeals of the District of Columbia in the suit brought by the railway com-

pany against the Interstate Commerce Commission to test the validity of the Commission's certificate. While this action of the Supreme Court may not be regarded as a final adjudication by that court of the merits on the controversy in favor of the United States, the effect is to leave in force and unreversed the decision of the Court of Appeals, and the railway company therefore tenders this payment on account of the principal, involuntarily, and without admitting that the claim of the United States has been conclusively adjudicated by the Supreme Court of the United States against the railway company.

"No interest has been included in this check because in the Department's letter of August 5, 1926, interest is claimed at the rate of six percent per annum on $1,269,905.20 from June 18, 1925, to the date of said letter and thereafter on $1,320,241.73 until date of payment, upon the assumption that the certificate from the Interstate Commerce Commission dated June 17, 1925, was effective and enforceable, although this letter recites that said Commission had issued a corrected certificate dated July 24, 1926, which cancelled the previous certificate."

There can be no question, we think, about the sufficiency of the protest, and no doubt about the involuntary character of the payment. In Maxwell v. Griswold, 10 How. 242, 256, 13 L.Ed. 405, the court said: "Now, it can hardly be meant in this class of cases, that, to make a payment involuntary, it should be by actual violence, or any physical duress. It suffices, if the payment is caused on the one part by an illegal demand, and made on the other part reluctantly and in consequence of that illegality, and without being able to regain possession of his property except by submitting to the payment."

There can be no doubt that the government's demand was illegal. That fact was definitely determined in the case of U. S. v. Great Northern Railway Company. Nor can there be any doubt that the payments were reluctantly made in consequence of the illegal demand, that being the only way in which plaintiff could regain possession of its property. In view of these facts we are impelled to hold that the payments sought to be recovered were involuntarily made by plaintiff, and under circumstances amounting to coercion and duress. The Secretary of the Treasury necessarily accepted the payments made by plaintiff upon the terms set forth in the letter of plaintiff's counsel tendering the payments, and an implied contract thereupon arose on the part of the defendant to refund the payments so made in case plaintiff was not indebted to the United States. Plaintiff is therefore entitled to recover and is hereby awarded judgment in the sum of $1,521,696.93.

It is so ordered.