PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1042
_____

THE ESTATE OF ANDREA YVONNE ARRINGTON,
Deceased, by and through the Administratrix of the Estate,
Audra L. Thornton Arrington

v.

JOHN MICHAEL, Police Officer; CITY OF CHESTER


John Michael,
Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 11-cv-4534)
District Judge:  Hon. J. Curtis Joyner
_____

Argued
October 17, 2013

Before:   RENDELL, JORDAN and LIPEZ*, *Circuit Judges.*

(Filed:  December 24, 2013)
_____

Suzanne McDonough   [ARGUED]
Holsten & Associates
One Olive Street
Media, PA   19063
        *Counsel for Appellant*

Frank N. DiMeo, Jr.   [ARGUED]
James D. Rosen
Rosen, Schafer & DiMeo
121 S. Broad Street – Ste. 800
Philadelphia, PA   19107
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge.*

In this substantive due process action involving the murder of a young woman, Officer John Michael of the Chester, Pennsylvania, police force appeals the denial of summary judgment by the United States District Court for the

_____

*Honorable Kermit V. Lipez, United States Court of Appeals Senior Judge for the First Circuit, sitting by designation.

Eastern District of Pennsylvania. He claims both qualified and statutory immunity. Since his conduct falls squarely within the immunity established by the Child Safety Lock Act of 2005, 18 U.S.C. § 922(z)(3), we need not address his claim for qualified immunity and will reverse the decision of the District Court with instructions to dismiss the complaint.

## I.      Factual Background and Procedural History

On July 20, 2009, Michael's son Aaron shot Andrea Arrington eight times, killing her. It was the tragic culmination of an abusive relationship. Aaron used his father's service-issued Smith & Wesson handgun in the murder.

Arrington and Aaron had lived together in an apartment with their infant son from 2007 to July 2, 2009, when Arrington petitioned for and obtained a temporary protection from abuse order (the "PFA") against Aaron. The order described Aaron's history of violence against Arrington, including incidents of choking, slapping, and, on one occasion two years prior to the PFA's issuance, giving Arrington a black eye. Those assaults were not the only illegality in Aaron's past. He had a criminal history that included check fraud (for which he was serving probation at the time he murdered Arrington), intimidation of another woman with whom he had a child, and shoplifting as a juvenile. He had also been charged with "indecent assault/rape" but was eventually found not guilty. (App. at 408.) Michael was aware of his son's several encounters with

3

the law.[1]  Although Aaron was a legal adult, he continued to have a room in his father's home, to drive his father's truck, and to receive mail at his father's address.

After the temporary PFA was issued, Michael met with Aaron to discuss the PFA.  Aaron considered the order to be inaccurate and told Michael that he would go to court on July 9, as required, to contest it in person.  Michael advised Aaron that, in the meantime, he should not try to retrieve his personal belongings from Arrington's apartment unless escorted by police officers.  On July 9, 2009, a final PFA was entered in the Delaware County Court of Common Pleas, which extended the terms of the temporary PFA by six months.  Pursuant to the final PFA, Aaron was evicted from the apartment and forbidden from possessing firearms.

On July 14, 2009 – five days after the final PFA was issued and less than a week before the murder – Aaron violated the PFA by returning to Arrington's apartment and threatening to "cut her up" if she reported the violation. (Appellee's Br. at 6; App. at 147.)  Despite that threat, Arrington promptly called the police.  Chester Police Officer William Swanson was on patrol and responded to the call, which became the subject of a criminal complaint that Swanson filed against Aaron the next day.  An arrest warrant for Aaron issued several days later, on July 20, 2009.

---

[1] Michael also knew that two of Aaron's children had died under mysterious circumstances while in Aaron's custody, including the child of the woman he had intimidated. After he murdered Arrington, Aaron confessed to two of his friends that he had killed those children.

4

Soon after Aaron left Arrington's apartment on July 14, Michael received a phone call from one of Aaron's friends, stating that Aaron had violated the PFA. Michael subsequently contacted Captain Anita Amaro, the chief of the Chester Police Department, to find out "[w]hat was going on." (App. at 424.) The Captain confirmed that Aaron had violated the PFA and that a warrant would soon be issued for his arrest; she also provided Michael a copy of Officer Swanson's complaint. Although Michael then attempted to call his son several times, he was unable to reach him.

With a planned vacation to Florida only days away and his son still out of contact, Michael resorted to writing Aaron two notes on July 16. He left the notes for Aaron on his dining room table, alongside Aaron's mail, hoping that Aaron would see them when he came over to pick up the mail. The notes reveal Michael pleading with Aaron to turn himself in. In the first note, Michael said that Aaron's violation was "not that serious" and that, if Aaron cooperated with the police, Michael would not only pay him a "bonus" of $1,500 but also post his bail. (*Id*. at 225.) At the same time, he asked Aaron to return his truck or else he would report it "stolen/or missing." (*Id*. at 244.) In the second note, Michael noted that, in the "worse scenario," Aaron would have to go to jail but that plenty of other people have been locked up. (*Id*. at 226.) Michael also claimed that, because he was a police officer, Aaron would get "a courtesy break." (*Id*.) In fact, he said, he had already spoken to people about Aaron's situation. (*Id*. at 226-27.) Fatefully, Michael also left the copy of Officer Swanson's criminal complaint for Aaron to read, which described Arrington's report to the police, including that Aaron had threatened to "cut her up" if she reported the PFA violation.

The day after Michael wrote his letters to Aaron, Aaron left a voice-message on Michael's home answering machine, saying that he was "okay" and would turn himself in when the arrest warrant was issued. (*Id.* at 425.) At that point, Aaron had not yet returned to his father's home and read the notes or the complaint. Michael heard the message that same day but did not remove the notes or the criminal complaint. The papers remained undisturbed on the dining room table when Michael departed for Florida on July 20.

In preparing to leave on vacation, Michael brought his service weapon home with him and locked it in his bedroom, as he customarily did when away. He had a wooden bedroom door that he locked with a "single-bolt lock," keeping one key on his key chain and the other hidden in the kitchen. (*Id.* at 415-16.) Inside the bedroom, Michael locked the gun itself with a police department-issued gun lock. He hid one key to the gun lock in a dresser drawer and the other he kept in his possession. He stored the magazine and the ammunition separately in a duffle bag, which he kept in a corner of the bedroom.

Michael maintains that he complied with standard police policy in storing his weapon. According to a Chester Police Department directive, it was optional, though "preferred," for off-duty officers to take their weapons home. (*Id.* at 380.) Captain James Chubb, a firearms instructor for the Department, stated in his deposition that, while "nothing is as safe as no weapon at home" (*id.* at 504), keeping a weapon at home is preferable to keeping it at the police station. Captain Chubb said, "it is a safety issue if an officer is done [with] work, puts his weapon in the locker, and then

6

decides to walk out to his vehicle in full uniform with no gun." (*Id*.)

At some point on July 20, 2009, while Michael was in Florida, Aaron went to his father's home and, after finishing a bottle of 99-proof alcohol, read the notes and police complaint that his father had left for him, moving them from the dining room table to the bedroom he customarily slept in while at his father's home. He then broke down his father's bedroom door and ransacked the room. He found the gun lock key in his father's drawer and the ammunition in the duffle bag. He next turned to a methodical search of the Internet to learn how to load the weapon, disengage the safety, and otherwise operate the gun. After that, he tracked Arrington down and shot her to death.

Following the murder, Aaron telephoned two of his friends and confessed to the crime – including a description of breaking into his father's bedroom and learning online how to operate the weapon. Shortly thereafter, Chester police officers shot and killed Aaron while he stood outside his father's home, brandishing the pistol.

Arrington's estate (the "Estate"), by and through its Administratrix, brought this action against Michael for civil damages pursuant to 42 U.S.C. § 1983 for the deprivation of Arrington's substantive due process right to bodily integrity. The District Court denied Michael's motion for summary judgment asserting qualified immunity and statutory immunity. The Court found that "[m]aterial disputes [] exist about the factual predicates necessary to apply the doctrine of qualified immunity to shield Officer Michael from suit." (*Id*. at 23.) With respect to the statutory immunity claim under

7

the Child Safety Lock Act of 2005 ("CSLA"), which grants immunity when a handgun is made "inoperable" by the use of a safety lock, the Court held the statute to be ambiguous and similarly determined that "material factual disputes exist on this record about whether the statute immunizes Officer Michael from civil liability in these circumstances." (*Id.*) This timely appeal followed.

## II.    Jurisdiction and Standard of Review

As a threshold matter, we must consider our jurisdiction.

Under 28 U.S.C. § 1291, we are empowered to review district court rulings that finally resolve cases, which the denial of immunity here clearly does not. However, in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949), the Supreme Court noted that there exists a "small class [of decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, [that are] too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 546. Such decisions can be reviewed on appeal before a final judgment is rendered. Rulings on qualified immunity are a common example. While a judicial creation, qualified immunity is, as the Supreme Court has long recognized, an "*immunity from suit* rather than a mere defense to liability; and ... is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As more fully discussed below, the statutory immunity provided in the CSLA is likewise an immunity from suit, and "[w]hen a policy is embodied in a constitutional or statutory provision

8

entitling a party to immunity from suit (a rare form of protection), there is little room for the judiciary to gainsay its 'importance.'"[2] *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994). We therefore treat the denial of such immunity as a final order fitting within *Cohen*'s "small class" of decisions, and adjudge the order here to be immediately appealable.

We exercise plenary review over a district court's denial of summary judgment. *Deweese v. Nat'l R.R. Passenger Corp.* (*Amtrak*), 590 F.3d 239, 244 n.8 (3d Cir. 2009). More particularly, because the denial of immunity in this case turns on statutory construction, we review the matter de novo, recognizing that statutory construction is "peculiarly appropriate for independent judicial ascertainment." *Dunat v. Hurney*, 297 F.2d 744, 746 (3d Cir. 1961) (quoting *O'Leary*

---

[2] We note an additional comparison to qualified immunity. That doctrine furthers a public interest in "the need to induce government officials to show reasonable initiative when the relevant law is not 'clearly established.'" *Will v. Hallock*, 546 U.S. 345, 353 (2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It extends immunity from suit so long as the behavior fits within the doctrine's parameters. Similarly, the CSLA reflects a congressional judgment about the parameters of reasonable behavior in securing guns (and thus preventing violence); it extends immunity when the behavior fits within the parameters Congress defined. That congressional judgment extends a narrowly defined, rarely extended protection, *see Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994), one sufficiently analogous to qualified immunity that we find its denial immediately appealable.

*v. Brown-Pacific-Maxon*, 340 U.S. 504, 508 (1951)) (internal quotation marks omitted); *cf. Bayer v. Monroe Cnty. Children & Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009) ("Under the collateral order doctrine, 28 U.S.C. § 1291 confers appellate jurisdiction over the District Court's denial, at the summary-judgment stage, of defendants' claim that they are entitled to absolute or qualified immunity, to the extent that denial turns on questions of law.").

## III.    Discussion

The CSLA provides, in pertinent part:

**(z) Secure Gun Storage or Safety Device.** –
   **(3) Liability for use.** –
      **(A)    In    general.    –**
      Notwithstanding any other provision of law, a person who has lawful possession and control of a handgun, and who uses a secure gun storage or safety device with the handgun, shall be entitled to immunity from a qualified civil liability action.
      **(B) Prospective actions.** – A qualified civil liability action may not be brought in any Federal or State court.
      **(C) Defined term.** – As used in this paragraph, the term "qualified civil liability action"--
         **(i)** means a civil action brought by any person against a person described in subparagraph (A) for damages resulting from

10

the criminal or unlawful misuse of the handgun by a third party, if--

(I) the handgun was accessed by another person who did not have the permission or authorization of the person having lawful possession and control of the handgun to have access to it; and

(II) *at the time access was gained by the person not so authorized, the handgun had been made inoperable by use of a secure gun storage or safety device*; and

(ii) shall not include an action brought against the person having lawful possession and control of the handgun for negligent entrustment or negligence per se.

18 U.S.C. § 922(z)(3) (emphasis added).

The District Court concluded that there is ambiguity in the italicized language, and therefore that the present dispute is appropriate for jury consideration. According to the Court,

Congress' use of the term 'inoperable' [within § 922(z)(3)] is puzzling. A strict reading of the term 'inoperable' would make it impossible for

11

the immunity provision to apply at all [because] a third-party, no matter how determined, cannot fire a truly 'inoperable' firearm and could, therefore, cause no harm which might result in liability from which the statute may immunize him or her.

(App. at 24-25.) On the other hand, the District Court noted, "a loose reading of the term 'inoperable' does not accord with the word's plain meaning." (*Id.* at 25.) Thus, the Court decided that "the intended scope of the immunity provision [is] ambiguous" and warranted resort to legislative history to ascertain Congress's true intent. (*Id.*) Citing one Congressman's interpretation that the immunity language "neither creates nor eliminates liability for gun owners who use safety devices," the Court applied "common law rules" to determine that "the secure gun storage or safety device must make the firearm inoperable *by reasonably foreseeable means.*" (*Id.* at 26 (emphasis added) (internal quotation marks omitted).) Because of what the Court found to be "material factual disputes [] about whether Officer Michael's actions actually rendered his service weapon 'inoperable' by reasonably foreseeable means" (*id.* at 27), it denied Michael's motion for summary judgment based on his claim of statutory immunity.

We disagree with that reasoning, which went awry at the first step. There is nothing ambiguous in the language of § 922(z)(3). It is true that, in the face of statutory ambiguity or uncertainty, we may "have recourse to the legislative history of the measure and the statements by those in charge of it during its consideration by the Congress," *United States v. Great N. Ry.*, 287 U.S. 144, 154-55 (1932), but "we do not

12

resort to legislative history to cloud a statutory text that is clear," *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994).

In this case, the interpretation of the statute is not a "factual dispute" that requires jury deliberation, but rather a pure question of law. *Forsyth*, 472 U.S. at 528. By its terms, the CSLA provides that, as long as an individual with lawful control of a gun has utilized a secure gun storage or safety device and has not authorized or permitted access to the gun, he or she is immune from suit in any "qualified civil liability action." 18 U.S.C. § 922(z)(3)(A). A qualified civil liability action is defined, with limited exceptions not relevant here, as a suit "for damages resulting from the criminal or unlawful misuse of the handgun by a third party" when there was unauthorized access to the handgun and "the handgun had been made inoperable by use of a secure gun storage or safety device." *Id*. § 922(z)(3)(C). The present fact pattern is plainly within that definition. The access gained by Aaron was clearly unauthorized. Moreover, the meaning of the word "inoperable" is clear. It refers to the use of a secure gun storage or safety device to prevent a gun from firing, the pertinent language being "inoperable *by use of a secure gun storage or safety device*." *Id*. § 922(z)(3)(C)(i)(II) (emphasis added). In other words, an individual is immune from suit if the handgun was rendered unusable because of a gun storage or safety device.

Taking its cue from the District Court, the Estate now disputes Michael's assertion of statutory immunity because of that same "ambiguity" surrounding the word "inoperable." (Appellee's Br. at 28-29.) The Estate contends that "a reasonable jury may find having the key near the lock is the equivalent of not using the lock." (*Id*. at 29.) But the Estate fails to consider the plain facts before us: that the gun was

locked behind a dead-bolted door, its key hidden in a dresser-drawer, and its ammunition separately hidden in a duffle bag in the corner of the bedroom. Outside of baldly challenging that the gun was indeed inoperable, the Estate never disputes that Michael's conduct in fact met the conditions set for immunity – perhaps, because it could not do so with any credibility on this record. Not only did Michael never give Aaron "permission or authorization ... to have access to [the gun]," 18 U.S.C. § 922(z)(3), but Michael used a "secure gun storage or safety device" in storing his weapon. *Id.* His conduct in no other way removed him from the statute's protection. While the statute abrogates immunity when a gun owner negligently entrusts a gun or acts with negligence per se, *id.* § 922(z)(3)(C)(ii), the Estate never expressly argues that Michael acted with such negligence. But even if it had, nothing in the record suggests that Michael's conduct with respect to his handgun was negligent, let alone that it rose to the level of negligence that would cause him to lose the statutory grant of immunity. [3] On the contrary, Michael took reasonable precautions to ensure that nobody – including Aaron – would have access to his gun. Given the significant care that Michael had taken to secure the weapon, the present § 1983 action appears to be exactly the kind of case that Congress wanted to prevent when it passed the CSLA. While

---

[3] Negligent entrustment is defined as "[t]he act of leaving a dangerous article (such as a gun or car) with a person who the lender knows or, should know, is likely to use it in an unreasonably risky manner," while negligence per se is defined as "[n]egligence established as a matter of law, so that breach of the duty is not a jury question." BLACK'S LAW DICTIONARY 1135 (9th ed. 2009). Michael's conduct does not meet either definition.

there may exist circumstances that give rise to a claim of negligent entrustment or negligence per se, or where the use of a gun lock or safety device does not render a gun inoperable, those are not questions we need now consider. The facts of this case establish that Michael's conduct is fully protected by the CSLA and he is immune from suit.

That conclusion is unaffected by the District Court's reliance on a single Congressman's comments in the legislative history. "[S]elective invocation of fragments of the floor debate is an object lesson in the perils of appealing to ... legislative history as a guide to statutory meaning. ... The law is what Congress enacts, not what its members say on the floor." *Szehinskyj v. Att'y Gen.*, 432 F.3d 253, 256 (3d Cir. 2005). Congress's decision to grant immunity from suit in the CSLA is embodied in clear language that we are bound to follow.[4] Officer Michael is, by the terms of the statute, entitled to that immunity, and the claims against him must be dismissed.

## IV.   Conclusion

For the foregoing reasons, we will reverse the District Court's order and remand with instructions to dismiss the complaint.

---

[4] No one has argued that the CSLA unlawfully impinges on the constitutional guarantees protected by 42 U.S.C. § 1983, and, given the specific and circumscribed character of the immunity, eschewing such an argument appears to have been wise.

15