# BUTTE, ANACONDA & PACIFIC RY. CO. *v.* UNITED STATES.

No. 8.  Argued October 16, 17, 1933.—Decided November 20, 1933.

128

*Mr. Daniel M. Kelly,* with whom *Mr. John A. Groeneveld* was on the brief, for petitioner.

*Assistant Attorney General Stephens,* with whom *Solicitor General Biggs* and *Mr. Elmer B. Collins* were on the brief, for the United States.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

This action was brought by the United States, on August 23, 1929, in the federal court for Montana to recover the sum of $487,116.31 paid to Butte, Anaconda & Pacific Railway Company on March 26, 1925. The payment was made pursuant to a certificate of the Interstate Commerce Commission for that amount, issued March 20, 1925, and addressed to the Secretary of the Treasury. Deficit Settlement with Butte, Anaconda & Pacific Ry., 94 I.C.C. 617. The Secretary, after receiving from the Comptroller-General his certificate approving the payment, issued a warrant for that sum and transmitted it

to the Treasurer of the United States. The Treasurer paid the Railway.

The proceeding before the Commission originated in a claim for $600,527.35 filed with it by the Railway under § 204 of Transportation Act, 1920, 41 Stat. 460, entitled "Reimbursement of Deficits during Federal Control." [1] Upon due hearing, the Commission concluded that the Railway was entitled to $487,116.31; and it offered to issue a certificate for that amount on condition that the Railway sign a release accepting the amount "in settlement of all claims against the Government under said section 204." This condition was agreed to. About two years after the money received had been disbursed by the Railway, partly in dividends to stockholders, partly in the expenses of operation, the Commission issued an order purporting to reopen the proceeding; and set a hearing "for the purpose of affording the Railway opportunity to show cause why the certificate issued on March 20, 1925, should not be revoked and its claim dismissed." The Railway, appearing specially, protested against the action of the Commission in attempting to reopen the proceeding; and challenged its power to do so. On March 7, 1927, the Commission entered an order purporting to cancel the certificate of March 20, 1925, and to dismiss the Railway's claim. Deficit Settlement with Butte, Anaconda & Pacific Ry., 117 I.C.C. 780. On June 8, 1928, the Under-Secretary of the Treasury demanded of the Railway repayment of the $487,116.31 received by it. Repayment was refused. Fourteen months later, this action was begun to recover the money.

---

[1] The term Federal control means, in this connection, the period from December 28, 1917 to March 1, 1920, during which the possession, use, control and operation of railroads and systems of transportation were taken over or assumed by the President. Proclamation of December 26, 1917; 40 Stat. 1733.

The case was first heard upon defendant's demurrer to the complaint. That demurrer was overruled. The defendant set up by answer the terms on which the payment had been made and the disposition of the money received. Then the case was heard upon the plaintiff's demurrer to the answer; that demurrer was sustained; and judgment for the Government was entered in the sum of $487,116.31 with interest at 8 per cent. from the date of the demand and costs. The Circuit Court of Appeals affirmed the judgment. 61 F. (2d) 587. This Court granted certiorari, 289 U.S. 717.

The action is brought to recover money paid by mistake. The charge is that the money was paid, because, in 1925, the officials misconstrued the word "deficit," so as improperly to extend the scope of § 204. That is a charge, not of mistake but of error of judgment—a judgment necessarily exercised in the performance of the duties of office. Neither the Commission in issuing the certificate, nor the Secretary of the Treasury, the Comptroller-General or the Treasurer when co-operating to make the payment, labored under any mistake of fact; or overlooked any applicable rule of law; or was guilty of any irregularity in proceeding. Moreover, if the word "deficit" was misconstrued, the error was not due to inadvertence. Ever since the enactment of Transportation Act, 1920, it had been recognized that the construction to be given the word "deficit" presented a difficult and important question. In 1920, before hearing those interested, the Commission attributed to the word the meaning now contended for by the Government. Protests against its then interpretation led the Commission to set, in 1921, a public hearing for the consideration solely of that question.[2] Counsel for many railroads participated and submitted briefs. On February 7, 1922, the

---

[2] See Annual Report of Interstate Commerce Commission for 1921, pp. 21–22; for 1922, p. 34.

Commission stated its conclusion in an elaborate report. In the Matter of the Construction of the Word " Deficit " as Used in Paragraph (a) of Section 204 of the Transportation Act, 1920, 66 I.C.C. 765. The rule there announced was consistently acted upon for over two years and a half. Under it, the Commission issued certificates to 71 carriers, including that here attacked.[3] Then there was a change in the membership of the Commission. On October 17, 1925, it overruled, in Deficit Status of Bingham & Garfield Ry. Co., 99 I.C.C. 724, its earlier decision; and in March, 1927, instituted against Butte, Anaconda & Pacific Railway Company the proceeding to revoke the certificate on which payment had already been made.[4] Obviously, " Mistake . . . there was none, but merely a revision of judgment in respect of matters of opinion." *United States* v. *Great Northern Ry. Co.*, 287 U.S. 144, 151.

The United States claims that the money can be recovered because it was a disbursement made without the authority of Congress. The argument is that the Commission had no authority to issue a certificate, and the financial officers of the Government had no authority to pay money, except to a carrier which had suffered a " deficit " in operations during the period of Federal control; that, properly construing that word, the Railway had not suffered a " deficit "; and that, having received the money which the officials were not authorized to pay, the Railway must restore it, since in dealings with the Government one is bound, at his peril, to know the limits of the authority of its agents. We have no occasion to determine which of the Commission's interpretations of the word " deficit " is the correct one. For we are of

[3] Annual Report of Interstate Commerce Commission for 1928, pp. 13–14.

[4] Annual Report of Interstate Commerce Commission for 1925, pp. 24–25.

opinion that the Government cannot recover the money paid in 1925, even if the Commission erred in attributing to the word " deficit " the meaning then acted on.

The decision was on the merits. The case is no different than it would have been, if the Commission had erred in any other ruling on a matter of law; or in a finding strictly of fact; or in some finding as to maintenance, depreciation or value—determinations called findings of fact but which rest largely in opinion. In making those decisions the Commission would necessarily act in a *quasi*-judicial capacity. If it misconstrued the term " deficit," it committed an error; but it did not transcend its jurisdiction. Since Congress has not provided a method of review, neither the Commission nor a court has power to correct the alleged error after payment made pursuant to a certificate. The Government cannot recover, because when Congress, by § 204, imposed the duty to certify to the Treasury the amounts severally due to carriers, it required the Commission—and hence authorized it—to determine whether the claimant was entitled to relief.

In making its determinations the Commission was required to decide many things besides the meaning of the term " deficit " or the amount thereof, if any. To appreciate the broad scope of the Commission's duty, we must consider the occasion and the character of the legislation and the precise question of construction here involved. On December 28, 1917, the President took possession and assumed control of all the railroads in the United States. By the Federal Control Act, March 21, 1918, 40 Stat. 451, Congress provided for compensation equal to the " average annual railway operating income for the three years ended " June 30, 1917, called the " test period." [5] Later,

[5] By the Federal Control Act, March 21, 1918, 40 Stat. 451, Congress authorized the President to agree with the several carriers that compensation for the period of Federal control shall be paid at a rate equal to their annual railway operating income for the three

the Director-General surrendered the possession and control of many short-lines. Their owners operated them thereafter privately during some part of the period of. Federal control. These owners claimed that such private operation had resulted in heavy losses attributable to the continued Federal control of the main transportation systems of the country. They urged upon Congress that the surrendered short-lines ought to be put into as good a position financially as they would have been in, if the Director General had retained possession of them throughout the period of Federal control. Recognizing that they had suffered, Congress included in Transportation Act, 1920, the provision for compensation contained in § 204. Paragraph (a) describes the carriers entitled to compensation:

" The term ' carrier ' means a carrier by railroad which, during the period of Federal control, engaged as a common carrier in general transportation, and competed for traffic, or connected, with a railroad under Federal control, and which sustained a deficit in its railway operating income for that portion (as a whole) of the period of Federal control during which it operated its own railroad or system of transportation; but does not include any street or interurban electric railway which has as its principal source of operating revenue urban, suburban, or interurban passenger traffic or sale of power, heat, and light, or both; . . ."

Paragraphs (c), (d) and (e) direct the Commission to ascertain the data from which the amount of deficits or losses are to be calculated; paragraph (f) fixes the amounts payable; and paragraph (g) provides:

" The Commission shall promptly certify to the Secretary of the Treasury the several amounts payable to car-

years ended June 30, 1917—called the " test period." Section 204 provided for determining similarly the amount of the deficit [or losses] payable by reference to such " test period."

riers under paragraph (f). The Secretary of the Treasury is hereby authorized and directed thereupon to draw warrants in favor of each such carrier upon the Treasury of the United States for the amount shown in such certificate as payable thereto. An amount sufficient to pay such warrants is hereby appropriated out of any money in the Treasury not otherwise appropriated."

Claims under § 204 were filed by 461 carriers.[6] Each claimant insisted that it had suffered a " deficit." The controverted question of construction discussed in this case is whether, by the use of the word " deficit," Congress intended that compensation should be paid to those carriers only which had suffered an actual [red-ink] loss in operation, or intended to put all the short-lines into as good a position as they would have been in if the Director General had retained possession throughout Federal control. If " deficit " be held to mean actual loss in operation, many of these carriers would receive nothing, as they had earned net income, although at a rate less than during the " test period." But it might prove upon investigation of the accounts that some carriers who had vainly claimed compensation on the basis of lessened income as compared with the " test period " were entitled to compensation because they had actually suffered a [red-ink] loss in operation. Compare Deficit Status of Fairport, Painesville & Eastern R. Co., 124 I.C.C. 323, 145 I.C.C. 684 This is true, because, while on the face of the accounts there appeared to have been net income, it might prove that there was, during the period, an operating loss, by reason of the fact that the carrier had failed to make the proper maintenance and depreciation charges. Where the right to compensation depends upon the propriety of the maintenance and depreciation

---

[6] Annual Report of Interstate Commerce Commission for 1929, p. 11.

charges, it may be impossible to determine, until the completion of the investigation into the accounts, whether the carrier is entitled to relief. Compare *Great Northern Ry. Co.* v. *United States,* 277 U.S. 172; *Continental Tie & Lumber Co.* v. *United States,* 286 U.S. 290; *Great Northern Ry. Co.* v. *United States,* 287 U.S. 144.

On the other hand, many a carrier may be denied compensation although the fact is unquestioned that a [red-ink] operating loss had been suffered. Such denial has been based sometimes on failure to prove other essential facts; sometimes because of a ruling on matter of law. The Commission has been required, in passing upon claims under § 204, to decide, in addition to the meaning of the word " deficit," many controlling questions of statutory construction which in a sense are preliminary. Among them are: What did Congress mean by the phrase " in general transportation " ? [7] What did Congress mean by the phrase " compete for traffic . . . with a railroad under Federal control " ? [8] What did Congress mean by the phrase " connected with a railroad under Federal con-

---

[7] In Deficit Claim of Manitou & Pike's Peak Ry., 79 I.C.C. 1; 94 I.C.C. 767; Deficit Status of Glenfield & Western R. Co., 150 I.C.C. 39; and in Deficit Status of Massillon Belt Ry. Co., 154 I.C.C. 1, it was held the term had a broader significance than " common carrier "; that it meant a carrier which might be utilized by the Government in the prosecution of the War; that, by this term, Congress intended to differentiate between railroads (common carriers) with reference to their utility and necessity as a part of the transportation system of the country; and that freight transportation, rather than passenger transportation, was considered a test of this utility and necessity. The claims were dismissed because these carriers did not meet the test erected.

[8] In Deficit Claim of Manitou & Pike's Peak Ry., 94 I.C.C. 767, 773, the claim was dismissed, among other reasons, because it was not shown that the competition was of such a character that the short-line suffered, through diversion, loss of traffic that otherwise might have moved over its line.

trol " ? [9]   What did Congress mean by the phrase " com-
·mon carrier " ? [10]   What did Congress mean by " a system
of transportation " ? [11]   Did Congress intend to grant
compensation to a carrier part of whose line is in a foreign
country? [12]   Did Congress intend that compensation
should be granted to carriers which had failed either dur-
ing the period of Federal control or during the " test
period " to render reports to the Commission and to keep
their accounts in conformity with its rules? [13]   Did Con-

[9] In Deficit Claim of Manitou & Pike's Peak Ry., 94 I.C.C. 767,
773, it was held, also, that although the carrier joined in through
passenger rates with railroads under Federal control, it was not within
this phrase, because there was not such a connection as would permit
the regular and general transfer of freight. Compare In Matter of
Final Settlement with the Nevada-California-Oregon Ry., under § 204
of the Transportation Act, 1920, 71 I.C.C. 548; Deficit Settlement
with Nevada County Narrow Gauge R.R., 90 I.C.C. 75, where it was
held that there may be a connection between a narrow gauge and a
standard gauge railroad within the meaning of paragraph (a).

[10] Compensation was denied as not having been so operated, In the
Matter of the Application of the Allegheny & South Side Ry. Co.,
etc., 71 I.C.C. 90; Deficit Status of Northern Liberties Ry., 72 I.C.C.
265; Deficit Status of Scottdale Connecting R.R., 124 I.C.C. 101;
Deficit Status of Calumet, Hammond & South Eastern R. Co., 154
I.C.C. 229; Deficit Status of Gideon & North Island R. Co., 158
I.C.C. 329; Deficit Status of Mississippi & Western R.R., 175 I.C.C.
486, 489; Deficit Status of Elk & Little Kanawha R. Co., 180
I.C.C. 10.

[11] Deficit Settlement with Cripple Creek & Colorado Springs R. Co.,
82 I.C.C. 129; 90 I.C.C. 271.

[12] In Deficit Status of United States & Canada R.R.-Grand Trunk,
Lessee, 76 I.C.C. 455, it was held that although this carrier made sepa-
rate returns to the Commission which showed a deficit, compensation
was not recoverable, the part of the system in the United States being
but a small portion of that of the controlling Canadian corporation.
Compare Deficit Status of Duluth, Winnipeg & Pacific Ry. Co., 76
I.C.C. 689—a part of the Canadian Northern System.

[13] The Commission held that Congress could not have intended to
grant compensation in such cases, although § 204 did not in terms
exclude carriers in intrastate commerce. Deficit Status of Empire &

gress intend that a certificate should issue where the operating loss was due to expenditures arising from occurrences unusual in the conduct of the carrier's business? [14] Did Congress intend that a certificate should issue where the operating loss was due to causes other than the War or the Federal control of the main lines of transportation? [15] Did Congress intend that a railroad technically under Federal control, but which actually was operated by its owners, should receive compensation under § 204? [16]

While § 204 granted a bounty, it conferred a right, and constituted the Commission a *quasi*-judicial tribunal to adjudicate claims thereunder. Thus it was called upon to pronounce a formal judgment on rights asserted. A decision adverse to the carrier on any one of the suggested questions of construction might compel dismissal of the claim; [17] thus relieving the Commission of the necessity of enquiring whether a deficit had been suffered. But it does not follow that such a decision would determine an issue of jurisdiction. Under this legislation, whether a

Southeastern Ry. Co., 117 I.C.C. 609. Many claims were dismissed on this ground. See, e.g., Deficit Status of Rural Valley R.R., 131 I.C.C. 509; Deficit Status of Dexter & Northern R.R., 138 I.C.C. 25; Deficit Status of Kentucky, Rockcastle & Cumberland R.R., 138 I.C.C. 27; Deficit Status of Eureka Hill Ry., 138 I.C.C. 29; Deficit Status of Pine Bluff & Northern Ry., 145 I.C.C. 251; Deficit Status of Massillon Belt Ry. Co., 154 I.C.C. 1.

[14] Deficit Status of West Virginia Northern R. Co., 82 I.C.C. 431.

[15] See Deficit Status of Calumet, Hammond & Southeastern Ry., 154 I.C.C. 229; New York & Pennsylvania Ry. Co. Deficit Claim, 162 I.C.C. 796; Arcata & Mad River R. Co., Deficit Status, 162 I.C.C. 641; Crittenden R. Co., Deficit Claim, 166 I.C.C. 548; Deficit Status of Elk & Little Kanawha R. Co., 180 I.C.C. 10.

[16] See Deficit Status of Abilene & Southern Ry., 72 I.C.C. 333; 79 I.C.C. 547; Deficit Status of Duluth, Winnipeg & Pacific Ry., 76 I.C.C. 689; Deficit Status of United Ry., 86 I.C.C. 661.

[17] Of the 461 claims filed, 180 in all were dismissed by action of the Commisson. Annual Report of the Interstate Commerce Commission for 1931, p. 10.

claimant seeking "relief has the requisite standing is a question going to the merits and its determination is an exercise of jurisdiction." Compare *General Investment Co.* v. *New York Central R. Co.,* 271 U.S. 228, 230. Though it were charged that the Commission erred in so dismissing the claim, the carrier could not by mandamus compel it to proceed with the enquiry. See *Abilene & Southern Ry. Co.* v. *Interstate Commerce Comm'n,* 56 App. D.C. 40; 8 F. (2d) 901; *Cripple Creek & Colorado Springs R. Co.* v. *Interstate Commerce Comm'n,* 56 App. D.C. 168; 11 F. (2d) 554; *Empire & S.E. Ry. Co.* v. *Interstate Commerce Comm'n,* 59 App. D.C. 391; 45 F. (2d) 292; *Interstate Commerce Comm'n* v. *U.S. ex rel. Arcata & Mad River R. Co.,* 62 App. D.C. 92; 65 F. (2d) 180. Compare *Interstate Commerce Comm'n* v. *Humboldt Steamship Co.,* 224 U.S. 474; *Louisville Cement Co.* v. *Interstate Commerce Comm'n,* 246 U.S. 638.

Under § 204, the Commission exercises functions broader than those customarily conferred upon auditing or disbursing officers. It sits as a special tribunal to hear and determine the claims presented. Compare *Work* v. *Rives,* 267 U.S. 175, 182; *Great Northern Ry. Co.* v. *United States,* 277 U.S. 172, 182. It renders a judgment upon a full hearing. In deciding any one of the enumerated questions of construction, as in other rulings of law or findings of fact, the Commission may err. The victim of the error may be either the carrier or the Government. Although the decision on the question of construction be favorable to the carrier, it may still fail to secure compensation, because there was, in fact, no deficit, whatever meaning be given to that word. On the other hand, an erroneous decision in favor of the carrier, on any of those questions, may result in the issue of a certificate and the payment thereunder of money which should not, and but for the error would not, be made. Since authority to pass upon the meaning of the word "deficit," and

upon each of the other questions of construction, is essential to the performance of the duty imposed upon the Commission, and Congress did not provide a method of review, we hold that it intended to leave the Government, as well as the carrier, remediless whether the error be one of fact or of law. Compare *United States* v. *Great Northern Ry. Co.*, 287 U.S. 144. The rule declared in *Wisconsin Central R. Co.* v. *United States*, 164 U.S. 190; *Grand Trunk Western Ry. Co.* v. *United States*, 252 U.S. 112, is not applicable here. The decision in *Continental Tie & Lumber Co.* v. *United States,.*286 U.S. 290, is not inconsistent with this view.

*Reversed.*