## STANDARD OIL CO. OF NEW JERSEY v. UNITED STATES (two cases).

## UNITED STATES v. ESSO STANDARD OIL CO.

## THE ESSO MANHATTAN.

United States District Court
S. D. New York.
Oct. 14, 1952.

Kirlin, Campbell & Keating, Ira A. Campbell, Raymond T. Greene, Elmer C. Maddy, New York City, for libelant.

Myles J. Lane, U. S. Atty., New York City, Edward L. Smith, Gilbert S. Fleischer, Attorneys Department of Justice, New York City, for United States.

WRIGHT, District Judge.

These actions which have been consolidated for trial are cross-suits arising out of the break-up of the Tanker Esso Manhattan on March 29, 1943 while outbound in ballast in the swept channel approach to New York harbor. The central issue involved is whether the break-up of the vessel was due to a war risk.

The Esso Manhattan is a standard T–2 tankship built to government design for the Standard Oil Company. She was completed in August 1942. Immediately on completion the vessel was time-chartered to the government under a standard form of Tanker Requisition Time Charter Party pursuant to which the government issued war risk insurance coverage and the owner agreed to assume or insure against marine risks. A group of private underwriters underwrote 75% of the marine risk and the government insured the other 25%. The Esso Manhattan had completed three voyages prior to March 29, 1943. On her last voyage before the disaster the Esso Manhattan grounded in the harbor of Aruba.

After discharging her cargo at Bayonne, New Jersey, on March 28th the Esso Manhattan commenced taking on ballast during the night. At 8 A. M. on March 29th when she cast off and proceeded toward the sea, the Esso Manhattan had not completed her ballasting. At that time she had filled No. 1 port and starboard wing tanks and Nos. 2 and 9 center tanks to an ullage of four feet. No. 9 port and starboard wing tanks were intended to be equalized with about 4 feet of water. Because of a leaky valve, however, substantially more water may have been admitted into them. After getting underway ballasting was resumed and at the time of the break-up, in addition to the ballast taken on at the dock, 4 feet of water had been gravitated into Nos. 2 and 3 wing tanks, port and starboard, with ballasting continuing.

The Esso Manhattan passed Ambrose light and entered the swept channel at about 10 A. M. The swept channel was about 5,000 yards wide marked by center line buoys approximately three miles apart starting at I buoy at the inshore end and continuing some thirty miles south and east to A buoy.

The weather was clear. The water temperature was 38 degrees and the air temperature was slowly rising from about 35 to 40 degrees. There was a moderate breeze and a long moderate ground swell setting onto the vessel as she proceeded at full speed out the swept channel.

As the Esso Manhattan was nearing B buoy at 12:05 P. M. still proceeding full speed ahead, she broke in half. At the time she was being observed by a blimp overhead which was escorting her through the swept channel. A second blimp was patrolling some distance ahead of the vessel and an acoustic and magnetic mine-sweeping flotilla was sweeping in the channel. As a matter of fact, sweeping was going on in the channel on a twenty-four hour basis. Also patrolling in the area some five miles away was

the Kimball, a Coast Guard Cutter equipped with sonar.[1]

On breaking, the hull of the Esso Manhattan in the vicinity of the break rose several feet in the water as the bow and stern dipped under the weight of the ballast. The break was accompanied by a loud noise variously described as rending plate, a grinding crash and as an explosion. The engines of the vessel kept ahead for about a minute after the break when they were shut off by an emergency trip lever. The vessel after breaking was held together by a light spar deck topside and momentarily by the bottom plating below.

The vessel was abandoned by the master and crew who were picked up by the Kimball. There were no injuries. Shortly thereafter the two halves of the vessel began to separate, pivoting on the port side at the break and forming a right angle. In this position the halves worked together in the seaway for some time before they completely separated and floated free of each other. Salvage vessels, after shifting the ballast in the two halves to facilitate towing, brought them into Bayonne, New Jersey, where preparation was made to have them brought to Todd Shipyard for rejoining and repair. The repairs had to be performed at the Todd Shipyard because Todd was the only yard with the necessary dock facility available. Also both the government and Standard had master repair contracts with Todd together with permanent inspectors stationed there to supervise the work.

One Gillespie of the Insurance Division of the War Shipping Administration requested Salvage Association, Inc., to survey the vessel in order to determine the extent of the damage and its cause. Gillespie entered his wartime service with the government from the private insurance field where as an average adjuster he was accustomed to dealing with the Salvage Association. The association was formed by and is owned by corporations constituting the private American insurance market, which corporations have underwritten 75% of the marine risk on the Esso Manhattan and which will bear that percentage of the loss if it should be found that the Esso Manhattan's damage resulted from marine risk.

The survey of the Esso Manhattan was conducted for the Salvage Association by one Sileo. After an investigation based primarily on the physical condition of the two halves of the vessel after they had been salvaged and without considering in any way the physical condition of the vessel immediately following its fracture, without consulting the numerous experts who investigated the matter, and without having available the reports on the subject by the Navy Board, the Bureau of Standards and the Brooklyn Polytechnic Institute, Sileo concluded that the damage to the Esso Manhattan was caused by an external contact explosion in the area of the fracture near the turn of the bilge. This conclusion was approved by Captain Bull as the head of Salvage Association, and Gillespie was so advised. Gillespie reported the conclusion of the Salvage Association to the Chief of Maintenance and Repair, War Shipping Administration, who gave instructions that the Esso Manhattan should be repaired under the government's master contract at Todd Shipyard. The Esso Manhattan was so repaired and the cost of repair was charged to and paid by the government. There is no issue in this case that the repairs were improperly performed or that the charge therefor was excessive. It appears without doubt that if Standard had assumed responsibility for the repairs, Todd Shipyard would have made them and the cost would have been the same.

It is the government's contention that these repairs were paid for by the United States under a mistake of fact and consequently it should be allowed to recover the monies thus expended. Standard on

---

1. Submarine detection gear, including echo ranging and receiving.

the other hand contends, first, that the government assumed responsibility for the repairs after an investigation of the cause of the casualty and that subsequent to such assumption, the government cannot be allowed to change its opinion as to its cause. It further urges that in any event the evidence shows the damage to the Esso Manhattan was the result of a war risk and consequently, under the war risk policy, the government is required to pay for its repair.

Before proceeding into an analysis of the evidence in this case Standard's first defense must be considered. Standard, in asserting that the government has merely changed its opinion as to the cause of the Esso Manhattan disaster and therefore cannot be heard to say that it acted under a mistake of fact, relies on several cases decided by the Supreme Court in which the government was not allowed to reclaim alleged overpayments.[2] The facts in those cases, however, are substantially different from the facts in the case at bar and the decisions therein do not preclude an independent assay of the evidence in this case to determine whether or not there has been a mistake of fact. The cases Standard cites all admit that money paid under a mistake of fact is recoverable but hold that in the circumstances of those cases there was no mistake of fact.

Here there can be no question but that the decisive issue is one of fact. Was the fracture of the Esso Manhattan the result of a structural weakness unattended by an explosion? It cannot be seriously urged that the answer to this question does not involve a finding of fact. If it is a fact that the Esso Manhattan ruptured from structural weakness unaccompanied by explosion, then the government paid for the repairs of the Esso Manhattan under a mistake of fact. And it is for this court to determine what is the fact.

■ It is conceded, as it must be, that when the United States goes into the insurance business, it participates therein subject to the same conditions as private citizens. Standard Oil Company of New Jersey v. United States, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519; United States v. National Exchange Bank of Baltimore, 270 U.S. 527, 46 S.Ct. 388, 70 L.Ed. 717; Cooke v. United States, 91 U.S. 389, 23 L.Ed. 237. But this court has been cited to no case wherein it has been held that a private insurer would be without recourse in the circumstances of this case. It must be remembered that the actions under scrutiny took place under wartime conditions, when expedition was the watchword, when the government was required to use on a wartime basis the associates and the servants of private underwriters, private underwriters incidentally who have a large stake in the outcome of this litigation.

■ These circumstances distinguish this case from a peacetime situation in which a private underwriter, after mature and skeptical investigation and deliberation by its own trusted employees and agents, comes to a final conclusion that it is bound to pay a loss under a policy of insurance. Here there was no final determination. The ship broke in two. It was needed for the war effort. A preliminary investigation indicated damage by war risk, and the cost of the repair of the vessel was paid for by the government under its master contract. To say that the government under these circumstances, where the question of laches has been waived as it is here, cannot recover monies paid out under the mistaken belief that it was under a legal obligation so to do is to misconstrue the basic governing principles of law and to substitute legal fiction for actual fact.

■ The basic principle governing this situation is clearly and tersely set out in the Restatement of the Law on Restitution, as follows:

"§ 18. Mistaken Belief in Duty under a Contract with Payee.

2. United States v. Great Northern Ry. Co., 287 U.S. 144, 53 S.Ct. 28, 77 L.Ed. 223; Butte A. & P. Ry. v. United States, 290 U.S. 127, 54 S.Ct. 108, 78 L.Ed. 222.

A person who has entered into a contract binding upon him and has paid money to the other party thereto under an erroneous belief induced by a mistake of fact that the terms of the contract required such payment, is entitled to restitution from the other, except where the mistake is only as to the time of payment."

No case has been cited and no case has been found which in any way derogates from this principle. As a matter of fact the Supreme Court in United States v. Barlow, 132 U.S. 271, at page 281, 10 S. Ct. 77, 80, 33 L.Ed. 346, gives it eloquent recognition:

" * * * As said by Baron Parke in Kelly v. Solari, 9 M. & W. 54, 58: 'Where money is paid to another under the influence of a mistake, that is, upon the supposition that a specific fact is true which would entitle the other to the money, but which fact is untrue, and the money would not have been paid if it had been known to the payer that the fact was untrue, an action will lie to recover it back, and it is against conscience to retain it.' See, also, Townsend v. Crowdy, 8 C.B.N.S. 477; Strickland v. Turner, 7 Exch. 208. Reasons for the application of the rule are much more potent in the case of contracts of the government than of contracts of individuals; for the government must necessarily rely upon the acts of agents, whose ignorance, carelessness, or unfaithfulness would otherwise often bind it, to the serious injury of its operations."

Having thus disposed of Standard's first defense, the basic factual issue in suit must be resolved. The resolution of this issue depends upon an interpretation and an analysis of the report of the board of experts convened by the Secretary of the Navy to study the causes of fractures in welded ships, the report of the tests made and conclusions arrived at by the National Bureau of Standards in its investigation of the cause of the fracture of the Esso Manhattan, and the re-

port of the tests made and conclusions arrived at by the Brooklyn Polytechnic Institute in its investigation of the cause of the fracture of the Esso Manhattan and similar fractures. In addition to these exhaustive reports there is the expert testimony produced by both sides. For the government, there are the experts on welded ships of the U. S. Coast Guard and Navy and the experts of the Army and Navy on the effect of the underwater detonation of explosives. For Standard, there is the witness Wilson, formerly with the American Bureau of Shipping and a member of the Navy Board, Sileo and Bull of the Salvage Association and the Chief of Ships' Maintenance and Repair for the Standard Oil Company.

All of the evidence indicates that the fracture of the Esso Manhattan began in a defective butt weld in the main deck slightly to port of the midline of the vessel between frames 55 and 56. The fracture extended across the top of the deck and down both sides through the E strake at the turn of the bilge. It appears that the bottom plates held momentarily and were subsequently torn apart in the way of the fracture coming down from either side of the vessel. The fracture was obviously of the brittle cleavage type because its face was at an angle of 90 degrees to the side of the plate rather than 45 degrees as would be expected in a shear fracture, and the metal itself along the line of the fracture appears to have been broken like cast iron rather than torn like steel.

The fact that the fracture was of the brittle cleavage type shows that the steel plate of the Esso Manhattan was notch-sensitive, which means that if a notch or abrupt discontinuity is present in the steel and the steel is below its critical temperature, it will fracture, beginning in the area of the notch, with the application of far less energy than would normally be required. The critical temperature of steel is that temperature below which it will sustain a brittle cleavage fracture rather than a shear fracture. It appears that a notch in-

hibits the plastic flow of the steel by concentrating the stress in the area of the notch with the result that when pressure is applied to notch-sensitive steel below its critical temperature, it will tend to break rather than bend.

The origin of the fracture in the Esso Manhattan is indicated by chevrons in the face of the break pointing from either side to the defective butt weld in the main deck. The defect in the weld was caused by porosity and slag in its center. This defect was covered over by a repair weld so that discovery of the defect was impossible without removing part of the repair weld.

Both sides are in agreement to the effect that it was in this defective weld that the fracture started and then propagated quickly across the deck and down both sides of the vessel. The government maintains that the pressure or energy applied in the area of the notch which started the fracture arose from the manner in which the vessel was ballasted and the movement of the ship at full speed through the swells in the sea. Standard's position is that an external under water explosion caused the damage.

As shown above, at the time of the break the vessel was in a hogged condition, which means that the ballast, concentrated as it was in the fore and aft tanks of the vessel with no ballast in the center tanks, exerted a bending pressure on the main strength deck of the vessel. The evidence shows there was a hogging stress on the vessel from her ballast water alone of 12,350 pounds per square inch in the vicinity of the break, which stress was greater than that recommended for tankers of the Esso Manhattan type. Added to this stress was the stress created by the action of the ground swells against the ship's plating and by the movement of the ballast in the tanks in the seaway. All of the experts, with the exception of Standard's, and all of the reports indicate that when this pressure was applied, the stress was concentrated in the area of the notch inhibiting the plastic flow of the steel, and causing a fracture in the vessel's notch-sensitive

steel then below its critical temperature. The fracture, once started, in the absence of crack arresters of any kind, quickly ran across the deck and down the sides.

The opinions of the experts and the exhaustive studies made by the Navy Board, the Bureau of Standards and the Brooklyn Polytechnic Institute on the causes of fracture in welded ships convince this court beyond any doubt that the cause of the fracture in the Esso Manhattan was a structural weakness, that is, a defective weld in a ship built of notch-sensitive steel operating under climatic conditions which brought the steel below its critical temperature.

Standard's expert witnesses are in conflict concerning the nature of the explosion which they maintain caused the damage to the Esso Manhattan. Sileo and Bull of the Salvage Association maintain that it was an explosion in contact with the port side of the vessel at the turn of the bilge between frames 55 and 56, whereas Wilson maintains that it was a noncontact explosion under water some distance off the vessel.

The succession of aerial pictures taken by the blimp after the fracture of the Esso Manhattan show the condition of the vessel immediately following the fracture as well as the maneuvers of the two halves after they had become separated. The aerial photographs taken immediately after the breakup show the fracture on the port side down through the turn of the bilge to be a clean break with one or more points of steel jutting out from the line of the rupture on the forward end port side of the stern half of the vessel and corresponding indentations along the line of the rupture on the bow half. No battered damage of any kind is shown.

Subsequent pictures in the series show that the two halves of the vessel soon parted and pivoted to port at the point of the fracture, forming a right angle. While the two halves were working together in the seaway, these points of steel above described apparently came in contact with the shell plating of the bow half of the vessel port side between

frames 57 and 58 making small holes and dishing in an area of approximately ten feet. In the process, the forward end port side of the stern half at the turn of the bilge was badly battered. This damage to the shell plating between frames 57 and 58 and the battered damage to the forward end of the stern half of the vessel is shown in photographs taken while the two halves were in dry dock. The dry dock pictures show a clean break down *through* the turn of the bilge on the after end port side of the bow half of the vessel and a similar fracture on the forward end port side stern half of the vessel down *to* the turn of the bilge, at which point there begins the battered area. Whereas as shown above, the aerial photographs taken immediately after the fracture show a clean break on both ends port side down *through* the turn of the bilge and no battering whatever on the forward end of the stern half.

In addition to accounting for the damage to the shell plating between frames 57 and 58, these photographs destroy the suggestion of Sileo and Bull to the effect that this casualty resulted from a contact external explosion striking the vessel's port side at the turn of the bilge alone the line of the fracture. These witnesses rely on the battered damage as indicating an outside contact explosion. First of all, no corresponding similar damage appears on the after end port side of the bow half of the vessel. It is to be assumed that if the vessel was struck in the way of the fracture the damage from the contact explosion would appear on both sides of the stricken area rather than on the after side alone. Further, as shown above, the battered damage to the forward end port side of the stern half occurred after the vessel broke in two because the photographs taken immediately after the fracture do not show that damage. This is clear even from a casual inspection of the photographs in question. Why Sileo and Bull, in the face of these photographs, persisted in their testimony to support the opinion previously given to Gillespie is difficult to understand.

Standard's main reliance, however, is not upon the testimony of Sileo and Bull, but upon the testimony of the witness Wilson whose opinion it is that the damage to the Esso Manhattan was caused by a noncontact external explosion, particles of which struck the vessel's port side near the turn of the bilge between frames 58 and 57. He maintains that while these particles did relatively slight damage to the ship's side, the effect of the explosion was to split the ship in half beginning on the main deck in the defective weld previously described.

The witness Wilson took the stand under the most unfortunate circumstances. Since 1950 he has been a consulting naval engineer in private practice and was placed on the stand by Standard as an expert to give his opinion as to the cause of the casualty. At the time of the casualty he was Assistant Chief Surveyor of the American Bureau of Shipping and in such capacity inspected the stern half of the Esso Manhattan in dry dock and the bow half as she lay in the water at Bayonne. He testified that only relatively recently had he reached a conclusion as to the cause of the disaster. He admits that he advised the agents of the F. B. I. investigating the casualty at the time that in his opinion the damage was not caused by an internal or by a contact explosion, but denies that he has ever expressed the opinion that no explosion of any kind was involved. Contrary to the testimony of Standard's other expert witnesses, Sileo and Bull, he states that the damage found on the forward end of the stern half port side near the turn of the bilge was not the result of the explosion he visualizes but probably resulted from the two ends of the vessel working together in the seaway after rupture. This latter testimony is of course within the confines of the statements made by the witness to the F. B. I. at the time of the casualty and identical with the explanation of that damage offered by the government witnesses.

After the Esso Manhattan disaster, the witness Wilson was named by the Secretary of the Navy as an alternate member of the board to investigate casualties to welded ships. He was also a member of the sub-board which was created as the working group for the main board. In addition, he was Chairman of the Welding Advisory Committee of the board which consisted, among others, of the witnesses Bissell and MacCutcheon. The report of the board made to the Secretary of the Navy clearly indicates that the damage to the Esso Manhattan was a structural failure not related in any way to an explosion. Wilson denies responsibility for any part of the report which so indicates, but the fact remains that the report was predicated primarily on the work of the Welding Advisory Committee of which Wilson was chairman and the work of the sub-board of which he was one of the most active members. Further, the witness Bissell prepared a report on the Esso Manhattan casualty for the board in which it is concluded in so many words that the damage to the Esso Manhattan was not caused by explosion. The witness Bissell testified that Wilson collaborated in the preparation of his report, that he read the entire report and those portions which were not acceptable to Wilson were changed to meet his objections, that he did not object to the conclusion that the Esso Manhattan disaster was not the result of an explosion. Wilson denied that he had read Bissell's report and had no recollection of being present at the meeting of the sub-board in which Bissell's report was accepted and approved. The witness Wilson is further embarrassed, as he himself admits, by the fact that while he was Assistant Chief Surveyor of the American Bureau of Shipping a letter bearing his initials and his approval was prepared in his office for the Chief Surveyor's signature, in which reference is made to the report of the National Bureau of Standards on the Esso Manhattan disaster and which approves the findings contained in the Bureau of Standards' report, those findings being that the Esso Manhattan disaster did not result from an explosion.

Just when Wilson came to the opinion that the Esso Manhattan disaster was the result of an explosion is not apparent from the record. The record does show, however, that while he was in a responsible position with the American Bureau of Shipping and a member of the various government committees and boards to which he was appointed, there is no indication that he was of such an opinion and it may be safely assumed that he came to this opinion after he left the American Bureau in 1950 to enter private practice and possibly after his retention in this matter by the Standard Oil Company. Be that as it may, under the circumstances it is impossible to accord his opinion substantial weight. It is inconsistent with the scientific evidence developed by the National Bureau of Standards, the Brooklyn Polytechnic Institute, The Society of Naval Architects and Marine Engineers and the Navy sub-board of which he himself was a member. Further, it is inconsistent with the physical facts developed by the lay testimony.

If there had been a non-contact explosion in the vicinity of the Esso Manhattan at the time she ruptured as Wilson suggests, the effect of that explosion would have been manifested in several ways. First, there would have been a terrific noise followed by a terrific impact, well distributed throughout the ship, against her sides and bottom. This impact would have been caused by the shock wave from the explosion. The impact from the shock wave would have been followed by a succession of impacts, less severe but unmistakable, caused by the bubble pulse which would follow the shock wave. Second, all glass and vitreous fixtures about the ship would have been broken and pieces of stationary equipment bolted in place would have been torn from their bases. Third, following the explosion debris and dead fish would have been observed on the surface of the water. Fourth, a slick

would have formed on the surface surrounded by a white collar of foaming water.

There is no credible evidence tending to show that any of these manifestations of explosion was present. It is true that some witnesses aboard the vessel testified to hearing an explosion at the moment the vessel cracked, but many others, also aboard the vessel, characterized the sound as a sharp loud grinding noise such as might be expected when a steel vessel breaks in two. No witness aboard the blimps or the Kimball saw or heard an explosion and the sonar gear aboard the Kimball failed to record evidence of an explosion in the area. There is no evidence whatever of a shock wave or bubble pulse from an explosion striking the vessel although there is evidence that on rupture the vessel, as might be expected considering the distribution of her ballast, jackknifed, dropping the bow and the stern ends several feet deeper into the water. There is no evidence that any fixtures, glass or otherwise, of any kind broke or even cracked on the Esso Manhattan at the time of the disaster. In fact, the evidence affirmatively shows that even the precision instruments on the bridge and the gauges in the engine room remained intact. There is no evidence whatever of debris or dead fish surfacing after the explosion. There is no evidence of an agitated condition of the water except from one witness, an employee of Standard, who, although when previously examined at the time of the casualty made no mention of it, said he saw a large spout simultaneously with hearing the noise of the explosion.

■ Under the circumstances, this court is compelled to the conclusion that an explosion played no part in the Esso Manhattan disaster and that, in fact, there was no explosion. The Esso Manhattan, like her sister ship, the Schenectady, was not a casualty of war, but a victim of herself.

Let decrees be prepared in accordance with the findings of fact and conclusions of law this day entered.

