## ADAMS et al.
### v.
### RAILROAD RETIREMENT BOARD.
### No. 13719.

United States Court of Appeals
Ninth Circuit.

June 29, 1954.

Clarence D. Phillips, H. H. Phillips, Phillips, Coughlin, Buell & Phillips, Portland, Or., for petitioners.

Myles F. Gibbons, Gen. Counsel, Railroad Retirement Board, Chicago, Ill., David B. Schreiber, Associate General Counsel, Louis Turner, Asst. Gen. Counsel, Chicago, Ill., and Ben Diamond, Chicago, Ill., on the brief, for respondent.

Before HEALY, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

Portland Electric Power Company, here called Power, for many years prior to 1930, operated an electric generation and transmission business, city traction lines, and an interurban railway line. In 1930, Portland General Electric Company, here called Electric, was organized as a wholly owned subsidiary of Power and all the electric utility properties and operations of Power were transferred to it. Two years later the city traction lines were turned over to Portland Traction Company, here called Traction, also a wholly owned subsidiary of Power.

From August 29, 1935, when the Railroad Retirement Act of 1935, 49 Stat. 967–973, was passed, until August 29,

1946,[1] Power was an "employer" under the Railroad Retirement Act.[2] This was because of its operation of the interurban line which had physical connections and exchanged service with certain steam railroads. Petitioners, 88 in number out of a group of 600 persons similarly situated, are employees or former employees on the payroll of Electric. They asserted in the proceeding in which the Board's decision was rendered, that they were employees of Power and "employees" under the Act.[3] This claim was predicated upon the fact that after Electric was formed and began operating in 1930, these petitioners, although receiving their pay checks from Electric, actually performed many services for Power. The general character of these services is mentioned hereafter.

In such cases the greater portion of the time of each petitioner was devoted to similar work for Electric. But such services were always available to Power, which thus was relieved of the necessity of having this type of work done by men on its own payroll.

In addition, petitioners say, they performed these duties under the direction of Power, and subject to its continuing authority.[4] To illustrate their point in this regard petitioners describe the situation of one of them, a Mr. Robertson, who performed work in preparing payrolls of Power. He reported to a general auditor who in turn reported to a president. But the auditor and the president occupied dual positions in that each was an officer and held the named position with both Electric and Power. Thus it is stated that at the important date in 1935,

hereafter mentioned, Mr. Robertson was under the supervision of the general auditor of Power who was supervised by the president of Power. Petitioners say that this demonstrates that Robertson was subject to the continuing authority of Power which could supervise and direct the manner of rendition of his service notwithstanding the men from whom he took his orders were also the auditor and the president of Electric.

The record also shows that although Mr. Robertson received his pay by means of a check drawn on the account of Electric, on whose payroll he was carried, yet Electric then charged to Power a sum of money representing the portion of his salary attributable to the work he did for Power.

Petitioners say that the facts with respect to Robertson's employment are fairly representative of the manner in which the other petitioners were employed and compensated, and we do not understand that this is controverted by the respondent Board. Petitioners say that notwithstanding they were admittedly in the employ of Electric, yet they were also employed by Power, that is, they were employed by both Electric and Power, and subject to an authority which was exercised as the composite joint act of both companies.

Attention is called to the fact that Power owned Electric, the officers of Power and Electric were the same, and all occupied the same building. It is said that in general all decisions, those of Electric, Power and Traction, after the separation of the original enterprise in

---

1. This was the date on which the interurban line of Power was sold to others pursuant to certain Chapter X proceedings under the Bankruptcy Act.

2. The 1935 Act was amended by the Act of June 24, 1937, c. 382, Part I, 50 Stat. 307. The Railroad Retirement Act of 1937 appears at Title 45 U.S.C.A. §§ 228a–228y.

3. § 228a(b) provides: "The term 'employee' means (1) any individual in the service of one or more employers for compensation, * * *."

As all connection between Electric and Power terminated shortly after 1946 (see note 1, supra), the claims here involved are limited to service in periods prior to 1946.

4. § 228a(c) provides: "An individual is in the service of an employer * * * if (i) he is subject to the continuing authority of the employer to supervise and direct the manner of rendition of his service * * * and (ii) he renders such service for compensation. * * *"

1930 and in 1932, were executed in a manner not distinguishable from the way in which they were carried out prior to that time;—the only difference say the petitioners is that the top executive was president of the three different companies instead of one and that the same situation related to the chain of command all the way down to the petitioners who did the actual work under those commands.

If petitioners are right in their contention, the consequences with respect to a petitioner who was an "employee" on August 29, 1935, is that he may receive credit toward an annuity under the Act for services rendered to an "employer" before as well as after January 1, 1937.[5]

Not long after the enactment of the 1937 Act Power made inquiry as to its status and that of its employees with respect to this question and advised its employees that only those on its own payroll were covered. Therefore for several years Power's compensation reports to the Board were limited to such employees. In 1942, the Commissioner of Internal Revenue, in dealing with the duty to pay taxes under the Carriers Taxing Act, 50 Stat. 437, made a ruling in line with the present position of these petitioners. During the same year the Board's general counsel made a similar ruling, holding that an employee on the payroll of Electric was also an employee of Power with respect to a portion of his services and compensation.[6] Thereafter

taxes computed under the Carriers Taxing Act were paid, in line with such opinions, upon "the portion of such employees' remuneration which was attributable to services performed for [Power]". During the period from 1942 to 1949 annuities were granted and certified to 54 of the petitioners.[7] Thus Mr. Robertson, before mentioned, retired in 1946 and the Board issued to him a certificate stating that he would be entitled to an annuity under the Act for the rest of his life. However, in 1950, the Board's general counsel changed his views expressed in the earlier ruling, and now gave it as his opinion that some 600 individuals who had been carried on the payroll of Electric, including the present 88 petitioners, were not employees of Power. The individuals, who had earlier been granted annuities, were then notified of their cancellation although recovery of benefits previously paid was waived. Petitioners applied to the Board for an order which in effect would reverse this later ruling and hold them employees entitled to benefits under the Act. The Board found against them, and they now seek review in this court.

The adverse decision of the Board is predicated primarily upon the terms and provisions of a so-called "inter-company agreement" dated September 1, 1932 between Electric, Power, Traction and the Willamette Valley Railway Company. The portions thereof set forth in the Board's findings are copied in the margin.[8]

---

5. 45 U.S.C.A. § 228a(f).

6. The ruling was: "It is, therefore, my opinion that Mr. A. H. Morris was an employee of the Portland Electric Power Company while rendering service for it from 1924 to at least March 1, 1939 and his service for that company during this period and the compensation therefor are creditable toward an annuity." (See Ex. 98, p. 1309 R.)

7. The respondent Board refers to these as 47 to whom annuities were awarded and seven whose husbands were awarded annuities.

8. "Whereas, it is necessary and convenient for some one of said parties to

furnish personal service, materials and/or supplies to some one or more of the other parties hereto; and

"Whereas, it is necessary and convenient that the parties hereto enter into this agreement covering said inter-company practices and relations;

⁂ * * * * *

"9. **Storeroom Service:** The Electric Company will purchase, store and issue any and all materials and supplies required by the Pacific Company [Power], the Traction Company and/or the [Willamette Valley] Railway Company which would ordinarily be handled through store room accounts, and the said Pacific Company, Traction Company and/or Railway Company will each pay to the electric

The existence of this agreement, the Board found, did not come to the attention of counsel for the Board when he made his first ruling that the employees of Electric in the position of petitioners were also employees of Power and entitled to benefits under the Act. This agreement, the Board held, demonstrates that the services of employees supplied by Electric to Power were not performed as a part of a joint operation of the two companies, but pursuant to Electric's undertaking to furnish those services to Power as a part of Electric's own operation. The position of the Board is that this agreement of September 1, 1932 is proof that petitioners were exclusively the employees of Electric.

Petitioners argue that the Board has given an improper interpretation to this

inter-company memorandum. They say that it is wholly unrealistic to give controlling significance to a memorandum executed between corporations one of whom is the master and the other the creature,—this especially in view of the evidence that the written memorandum was executed primarily to satisfy certain requirements of the Public Utilities Commissioner of the State of Oregon.

For reasons which will appear hereafter we do not deem it necessary to express any opinion as to whether the Board has rightly interpreted that written agreement, particularly in view of the deference which this court is wont to give to findings of fact made by administrative boards when reviewed by this court.[9]

Company for the materials and/or supplies furnished to it, a price which shall be calculated at actual cost to the Electric Company, plus the actual expense incident to handling such materials and supplies through the store room.

"10. General Clause: It is recognized that it is impossible to cover specifically every item of service between the parties hereto which may arise during the term hereof, and the parties by this agreement have only attempted to specifically cover the major items of inter-company operations, leaving the other items of service to be covered under the agreements of this paragraph; accordingly, it is agreed by the parties hereto that when any materials, supplies, office equipment, telephone service and/or personal service, and/or any other service, shall be furnished by one party hereto to any other party hereunder at the request of such other party, or with the express or implied consent of such other party, then the party using such material, supplies and/or service shall pay to the party furnishing the same the actual cost thereof, or the reasonable value thereof in case the actual cost thereof cannot be reasonably determined, and in the case of any joint user by two or more of the parties hereto, then the expense thereof shall be assumed by the parties using the same upon an allocation of the said actual cost or said reasonable value, based upon the proportional extent of the use of each party.

"11. Term: The term of this agreement shall * * * automatically continue from month to month * * *,

provided, however, that any party hereto may withdraw from this agreement and terminate this agreement as to it * * * by giving each of the other parties hereto thirty (30) days' written notice. * * *"

9. Another interesting question which, although probably one of law, we also find it unnecessary to resolve, is whether under the circumstances the Board, after first awarding 54 of the petitioners annuities (which awards apparently became final), could withdraw such awards. The annuities under the Act are not gratuities. They are matters of right. The written contract upon which the Board now acts was in existence when the awards were adjudicated and the Board's failure previously to take the contract into consideration was caused neither by fraud nor concealment. We do not here feel called upon to express any opinion as to whether the principles which have led to the rules of res adjudicata and of estoppel by judgment in respect to controversies traditionally heard in courts should have equal force in respect to administrative adjudications of the character here involved. Of course no unsuccessful litigant in an ordinary law suit would think that after the time for motions for a new trial and for appeal had expired he could obtain a new ruling contrary to the former one merely by showing that some previously existing fact was not produced at the trial. Concepts of an orderly society require that at some time a period be put to such controversies. See Butte, A. & P. Ry. Co.

During the consideration of this matter counsel for the parties filed additional briefs dealing with some questions which this court propounded to them.[10] It will be noted that these questions are prompted by that portion of § 228a of Title 45 which reads as follows: "The term 'employer' means any carrier (as defined in subsection (m) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad, * * *." The problem is whether the 88 petitioners, although on the payroll of Electric, are not nevertheless employees within the meaning of the Act by reason of the fact that Electric is at least with respect to its employment of these particular employees itself an employer within the meaning of the Act because it is a "company which is directly or indirectly owned or controlled by one * * * such carriers * * * and which operates any equipment or facility or performs any service (except trucking service, cas-

ual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad".

Petitioners answer this inquiry with an emphatic *"Yes"*. The respondent Board says that petitioners cannot be brought within the Act by treating Electric as an employer within the quoted language for several reasons. In the first place, it says, the carrier service performed by Electric was mere "casual" service within the excepting clause; secondly, those services on the part of Electric were inconsequential and so minor when compared with the total business and total payroll of Portland General Electric Company that they cannot be deemed anything other than casual services within the meaning of that excepting clause. Thus it is pointed out that Electric's total revenue from the sale of electrical energies in each of the years 1937–38–39, exceeded nine million dollars and its payroll exceeded two million six hundred thousand dollars. These figures are contrasted with the total charges for labor rendered by Electric to Power in those same years, which were respectively $24,737, $24,172 and $18,608.

Section 202.6 of the Board's Regulations undertakes to define the term "casual" service and the "casual" operation of equipment or facilities. The first portion of that definition, which is given in

v. U. S., 290 U.S. 127, 135, 54 S.Ct. 108, 78 L.Ed. 222; United States v. Great Northern Ry. Co., 287 U.S. 144, 151, 53 S.Ct. 28, 77 L.Ed. 223; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402–404, 60 S.Ct. 907, 84 L.Ed. 1263; cf. Davis on Administrative Law, (1951), § 172.

10. Those additional questions as submitted by the court were as follows:

"1. During the period here in question were the services furnished by Portland General Electric Company, or some of them, 'services in connection with the transportation of passengers or property by railroad', within the meaning of § 228a of Title 45? See Railroad [Retirement] Board v. Duquesne [Warehouse] Co., 326 U.S. 446 [66 S.Ct. 238, 90 L. Ed. 192]; Despatch Shops v. Railroad Retirement Board, [80 U.S.App.D.C.

374], 153 F.2d 644; Despatch Shops v. Railroad Retirement Board, 2 Cir., 154 F.2d 417; and Spencer v. Railroad Retirement Board, 3 Cir., 166 F.2d 342.

"2. Could it be said that any of such services are 'inherent or vital to the sustained functioning of a railroad system', as in the case of the repair and construction of rolling stock (Despatch Shops cases), or the supplying of water (Spencer case)?

"3. If the preceding questions are answered in the affirmative, would Portland General Electric Company then be an 'employer' under the Act?

"4. Is the scope of our review, as defined in Title 5, § 1009, and Title 45, § 355(f), such that we may consider whether the Board should have examined and determined the foregoing questions?"

the margin,[11] is a fair statement of the usual or common meaning of the term "casual". However, it does not appear from the record here that the services rendered by Electric to Power through these petitioner employees was either irregular or infrequent. On the contrary the inference here must be that such service or operation would be repeated, for Power was unable with the employees on its own payroll to perform these functions.

While the amount of labor charge mentioned above was small when compared to the total payroll of Electric itself, it does not appear that those charges were relatively so small when compared to the total labor cost of Power. It is Power's costs which are significant here and not those of Electric, which was primarily engaged in a different enterprise. Judged in relation to Power's labor cost it cannot be said that the labor thus charged by Electric to Power was inconsequential even if it be assumed that the idea of "insubstantial" could properly be added to the Board's definition of "casual" service. We think that the footnote on page 452 of 326 U.S., on page 241 of 66 S.Ct. (Railroad Retirement Board v. Duquesne Warehouse Co.); furnishes an illustration of what was intended to be comprehended within the term "casual" service. The illustration there supplied is that of employees of a contractor "occasionally employed by a 'carrier' to repair a depot or build a bridge."

The respondent Board next argues that to hold that Electric was an employer within the quoted language would accomplish an absurdity in that the result would be that Electric would have to be treated as an employer under the Railroad Retirement Act as to all its operations and that in consequence all its employees would be covered.

The Board itself has dealt with this situation in its rule 202.9. (Title 20, C.F.R.).[12] This deals with the company, like Electric, which is owned or controlled by a carrier and which performs a service in connection with the transportation of passengers or property by railroad although the company itself is principally engaged in some other business.[13] In such a case the Board is charged with securing information which

11. Title 20, Code of Federal Regulations, § 202.6: "Casual service and the casual operation of equipment or facilities. The service rendered or the operation of equipment or facilities by a controlled company or person in connection with the transportation of passengers or property by railroad, is 'casual' whenever such service or operation is so irregular or infrequent as to afford no substantial basis for an inference that such service or operation will be repeated, or whenever such service or operation is insubstantial."

12. The rule making power of the Board is stated in Title 45, § 228j.

13. "§ 202.9 Controlled company or person not principally engaged in service or operation in connection with railroad transportation. (a) With respect to any company or person owned or controlled by one or more carriers or under common control therewith, performing a service or operating equipment in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad, but which is principally engaged in some other business, the Board will require the submission of information pertaining to the history and all operations of such company or person with a view to determining whether it is an employer or whether some identifiable and separable enterprise conducted by the person or company is to be considered to be the employer, and will make a determination in the light of considerations such as the following:

(1) The primary purpose of the company or person on and since the date it was established;

(2) The functional dominance or subservience of its business which constitutes a service or operation of equipment or facilities in connection with the transportation of passengers or property by railroad in relation to its other business;

(3) The amount of its business which constitutes a service or operation of equipment or facilities in connection with the transportation of passengers or prop-

will permit it to determine whether the company as a whole shall be dealt with as an employer or whether some identifiable and separable enterprise conducted by that company is to be considered to be the employer.

 It is thus clear that the Board's rules are such that when it confronts a situation of the kind here presented, of a controlled company performing some limited service in connection with the transportation by railroad, and where the main or principal business of the controlled company is "some other business", the Board may separate the services or operations connected with transportation from the other business of the controlled company and treat the former separated enterprise as alone constituting the employer for the purposes of the Act. It is noteworthy that the rule does not contemplate simply disregarding in its entirely a controlled company of that character. The rule contemplates that either the company in its entirety or some identifiable and separable enterprise conducted by it shall be brought within the comprehension of the Act.

The fact that we do have here a controlled corporation, the major part of whose business has nothing to do with the transportation of passengers or property by railroad, distinguishes the case of course from Despatch Shops v. Railroad Retirement Board, 80 U.S.App.D.C. 374, 153 F.2d 644, and Despatch Shops v. Railroad Retirement Board, 2 Cir., 154 F.2d 417. But in those cases both courts emphasize the practical reason why it was necessary that the term employer be extended to cover the wholly owned corporation which performed those services for the railroad. We think that a complete disregard of the function of a wholly owned corporation like Elec-

tric which performed some transportation services as here, merely because its major enterprise is another business, would be to provide a loophole for evasion which it was not the congressional intent to permit. What was said in the Despatch Shops cases, supra, is not without cogency here. Both courts said (one quoting from the other): " 'If Despatch, in this situation, is not an "employer" under the terms of the Act, it can be readily seen that the railroads would be free to take from under the Act virtually all of their workers whose employment is in the "supporting" activities, through the simple expedient of setting up wholly owned corporate affiliates to perform these services. It is conceivable that everything from maintenance-of-way through engineering or bookkeeping might be done by so called "independent" corporations. The application of this Act and of the other Acts passed for similar purposes and embodying the same language could be so severely limited as to render them of little worth in achieving the purposes for which they were passed.' " 154 F.2d 419.

We have here "some identifiable and separable enterprise" carried on by Electric having to do with the performing of a service or the operating of equipment in connection with the transportation of passengers or property by railroad. Plainly enough the enterprise here is not as readily identifiable as if Electric had maintained a separate railroad department. But it is not questioned that Electric, during the period here in question, did in fact operate equipment and facilities and performed services "in connection with the transportation of passengers or property by railroad." Nor is there any serious question as to what those operations and services were.

erty by railroad and the ratio of such business to its entire business;

(4) Whether such service or operation is a separate and distinct enterprise;

(5) Whether such service or operation is more than casual, as that term is defined in § 202.6.

(b) In the event that the employer is found to be an aggregate of persons or legal entities or less than the whole of a legal entity or a person operating in only one of several capacities, then the unit or units competent to assume legal obligations shall be responsible for the discharge of the duties of the employer."

Power had on its own payroll the men who operated the Electric locomotives to haul the trains, but a large number of other services and operations, without which no carrier could be expected to operate, were handled by crews and employees on Electric's payroll. These were the men who maintained and repaired the overhead trolleys, the electric lines, and performed other necessary electric work to keep the trains running. They were men who supplied engine and equipment repairs; who furnished the customary engineering and right of way services for the railroad. The carrier could not operate without accounting services, the services of a purchasing department, or a department which cared for poles and their replacement in the overhead trolley system. The carrier could not operate without correspondence and stenographic service. It required bridge and building services, a safety engineer, and repairs for its automotive equipment and its general rolling stock.

 We hold that in furnishing these and similar services Electric was an employer within the meaning of the Act and its employees performing these services were employees.

We think that it cannot be denied at this stage that the arrangement by which these various services were provided for constitute an "identifiable and separable enterprise" which was carried on by Electric. The Board experienced no difficulty in identifying the 54 of these 88 petitioners to whom awards were previously made.[14]

We hold that as to those 54 petitioners the services performed by them while on Electric's payroll represented an identifiable and separable enterprise to be considered to be that of an employer within the meaning of the Act.

As for the remainder of the 88 petitioners now before us, the matter must be remanded to the Board with directions that the Board ascertain from the record now before it, or such additional evidence as may be produced, which of them are entitled under the rules here stated to be adjudged "employees". We perceive no reason for applying to their cases any more rigid standards of proof than those which the Board has itself heretofore applied with respect to the 54 petitioners to whom such awards were previously made.

The decision of the Board with respect to such 54 petitioners is reversed and the awards of retirement benefits previously made to said petitioners are ordered reinstated.

The decision with respect to the remainder of the petitioners before us is reversed and the cause is remanded to the Board for further hearing and other proceedings not inconsistent with the foregoing opinion.

---

14. These awards were made by the Bureau of Retirement Claims which under the Board's Rule 260.1 (of Title 20, C.F.R.) was its adjudicating unit.